UNITED STATES v. CHESAPEAKE & O. RY. CO.

(Circuit Court of Appeals, Fourth Circuit. February 27, 1914.)

No. 1228.

1. RAILROADS (§ 229*)—REGULATION OF RAILROADS—EQUIPMENT.

The amendment of Act April 14, 1910, c. 160, 36 Stat. 298 (U. S. Comp. St. Supp. 1911, p. 1327), to the Safety Appliance Act, providing that, where any railroad car has been properly equipped and the equipment shall become defective while the car is being used by the carrier on its line of railroad, it may be hauled from the place where the defect was first discovered to the nearest available point where it can be repaired, does not allow cars with defective equipment to be moved on side tracks or in switching yards except for the purpose of hauling them to the nearest available point for the purpose of making repairs, and hence the statute was violated by moving a car from one yard to another placing it on a side track, where it was required to be moved frequently and by failing to make repairs until it was moved back to the first yard 12 days after the discovery of the defect in the equipment.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. RAILROADS (§ 229*)—REGULATION OF RAILROADS—EQUIPMENT.

> Under amendment of Act April 14, 1910, c. 160, 36 Stat. 298 (U. S. Comp. St. Supp. 1911, p. 1327), to the Safety Appliance Act, relative to repairing the equipment of a railroad car which becomes defective while being used, if the repairs can be made at the point where the defect in the equipment is discovered, it is incumbent on the carrier to repair the defect as soon as the services of a repairman can be had, but, if not, the car may be hauled to the nearest available point and not used in the meantime on its lines between stations or in the yards.

> [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*]

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Judge.

Action for a penalty by the United States against the Chesapeake & Ohio Railway Company. Judgment was rendered for defendant on a directed verdict, and the United States brings error. Reversed.

D. Lawrence Groner, U. S. Atty., of Norfolk, Va., and Philip J. Doherty, Sp. Asst. U. S. Atty., of Washington, D. C. (Hiram M. Smith, Asst. U. S. Atty., of Richmond, Va., on the brief), for the United States.

David H. Leake, of Richmond, Va. (D. H. and Walter Leake, both of Richmond, Va., on the brief), for defendant in error.

Before PRITCHARD and WOODS, Circuit Judges, and DAYTON, District Judge.

PRITCHARD, Circuit Judge. This action was begun by the United States on August 6, 1912, to recover $200 from the defendant in error, the Chesapeake & Ohio Railway Company, for violation of the Safety Appliance Act. The declaration contained two counts, the first count relating to a violation of the act in the use by the railway company of a New York, New Haven & Hartford Railroad car, No. 75,653, while the same was in a defective condition, and the second count relating to a Southern Railway car, as to which there is no controversy on this writ of error. The jury, by direction of the court, found against the United States as to the first count and for the United States as to the second count. A motion was made by the United States to set aside the verdict, which was overruled. (The interstate character of the railway and the cars in question is admitted.)

The evidence, so far as it relates to the first count of the declaration, as to which, as just stated, the jury found against the United States, briefly, is as follows:

[1] Car No. 75,653 of the New York, New Haven & Hartford Railroad Company was brought into the Seventeenth Street yard of the Chesapeake & Ohio Railway Company at Richmond, Va., on February 29, 1912. This car formed part of a train which arrived at the yard about 3:15 p. m., and, on its arrival, was inspected by government inspectors, who found the chain at the "B" end of the car connecting the lock and Climax Coupler broken, so that there was no connection between the uncoupling lever and the uncoupling mechanism, and, in its then condition, it was impossible to couple the car or open the coupler otherwise than by going in between the cars.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Shortly after this discovery by the inspectors the car was inspected by the railroad inspector located at the Seventeenth Street yard, and a bad order mark was placed on it, and it was thereupon switched from point to point several times, with a number of other cars and placed on different tracks. Late in the afternoon while it was standing on the track near the scales, Brakeman John Scott went in between the end of the defective car and another car for the purpose of raising the mechanism and separating it from the other car, shortly after which engine 44 was coupled to the car and pushed it down from the Seventeenth Street yard onto track No. 9, in the Broad Street yard; the trip consuming about ten minutes, the distance being about three-quarters of a mile. The car, both when it arrived at the Seventeenth Street yard and later in the day when it arrived at the Broad Street yard, was loaded with corn and sealed, and remained at the Broad Street yard from the 29th day of February until the 12th day of March, without having the repairs made, and on the latter date it was returned to the Seventeenth Street yard and shifted almost to the identical point which it had occupied when it was removed from there to the Broad Street yard, 12 days before, and was then and there repaired.

The witness for the railroad testified that a lock block and a new lock chain were required to make the repairs, and that such repairs could have been and were eventually made in about ten minutes; that it was not necessary to take the car to the shops; that there were more facilities for repairing the defects at the Seventeenth Street yard than at the Broad Street yard; and that the inspector who actually made the repairs, to wit, W. J. Gibson, intended, when he put the bad order mark on it, that it should be, as later it was, repaired at the Seventeenth Street yard.

At the conclusion of the evidence, both plaintiff and defendant moved for an instructed verdict, and the court instructed the jury to find a verdict for the defendant on the first count, and the case now comes here on writ of error.

It is contended by the defendant below that the following proviso in the amendment of 1910 exempts it from liability in this instance:

"Where any car shall have been properly equipped, as provided in this act and the other acts mentioned herein, and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired."

It is manifestly the purpose of this statute in cases where equipment on any car may become defective to permit the railroad company to haul the same to the nearest available point where the proper repairs can be speedily made.

Any movement of a defective car was held to be a violation of the act as originally passed. It was undoubtedly the purpose of Congress in adopting the amendment of 1910 to somewhat relax the rigid rule which had theretofore been announced as to the time within which repairs of defective cars should be made. While this is true, Did Congress by this proviso intend to afford no protection to the employés while cars were being operated within the yard limits?

It is a matter of common knowledge that the danger incident to coupling cars is as great, if not greater, in switching yards than on the line between stations. The fact that the statute provides that "such car may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired" clearly shows that it was the purpose of Congress not to permit unnecessary delay in making repairs of defective equipment by keeping such cars on side tracks and moving them from place to place unless it should be for the purpose of hauling them to the nearest available point for the purpose of making needed repairs.

It cannot be reasonably contended that the movements of the car in question from Seventeenth Street to Broad Street, and from Broad Street back to Seventeenth Street, was for the purpose of repairing the same, inasmuch as it appears by the evidence that the repairs could have been made when discovered, and at all events could have been made at Seventeenth Street before it was moved from that point. Even if it were not the duty of the inspector to make the repairs, he certainly was charged with the duty of reporting the defective condition of the equipment, and this he must have done in making his report of the day's work. Therefore it is but fair to assume that the company had full knowledge of the defective condition of this equipment within at least 12 hours from the time the inspector made the discovery. But, notwithstanding this fact, the equipment was permitted to remain in a defective condition while the car was being shifted from point to point at Broad Street and finally to Seventeenth Street, and was not taken back for repairs until 12 days thereafter. During this time the employés of the company whose duty it was to couple and uncouple the cars were continually subjected to the dangers incident to the defective condition of the equipment. Under this evidence can it be said that the defendant hauled this car after it discovered its condition "to the nearest available point where such car could be repaired"?

District Judge Sessions, in the case of United States v. Pere Marquette Railroad Co. (D. C.) 211 Fed. 220, in referring to the contention that in that case the movement of the train in question was what is known as a "switching movement," and that under this proviso did not apply, said:

"The name given to the movement is of no importance, and its character is not controlling. That the use of a car whose coupling apparatus is inoperative upon the tracks of a railroad company engaged in interstate commerce and in connection with such commerce, either in a switch yard, or in actual road service upon the main line, is a violation of the Safety Appliance Acts, is no longer an open question."

To hold that this proviso applies only to trains operated on lines between stations would in a large measure deny protection to those for whose benefit the law was passed and give a narrow and artificial construction to the statute.

We do not deem it necessary to review the many authorities cited by counsel for the government, as well as those cited by defendant, further than to say that we have carefully considered the case of Erie Railroad Co. v. United States, 197 Fed. 287, 116 C. C. A. 649, decided by the Circuit Court of Appeals for the Third Circuit. That

case supports the defendant's contention, notwithstanding the facts upon which it is based differ somewhat from the case at bar. While we have the greatest respect for that court in its decision, yet a careful consideration of the statute impels us to dissent from the views therein expressed.

To hold that the words "while such car was being used by such carrier upon its line of railroad" are intended to limit the statute in its application to the main line would, in a large degree, nullify the act. When we consider the statute in regard to safety appliances, we are forced to the conclusion that it must have been the intention of Congress that the same should apply to side tracks and yard tracks as well as the main lines.

[2] The requirement that a car with defective equipment may be hauled from where such equipment is first discovered to be defective or insecure "to the nearest available point where such car can be repaired" was evidently designed for the purpose of giving the railroad company sufficient time within which to make such repairs as could only be made at the shops of the company, or at a point where material and appliances were kept for that purpose. However, in this instance, it is admitted by the railroad that it was not necessary to haul the car in question to the shops or to any particular point in order to repair the defective equipment. It could have been repaired at the Seventeenth Street yard where the defect was discovered, or it could have been repaired at the Broad Street yard, and no excuse is shown for not making the repairs while the car was kept at either of these places. In other words, we think the statute contemplates that if, when the defective equipment is discovered, it can be repaired at the point where the discovery is first made, then it is incumbent upon the railroad company to repair the same as soon as the services of a repairman can be had; but, if the defect is of such character that it cannot be repaired at the point where discovered, such car may be hauled to the nearest available point for that purpose, and not used in the meantime on its lines between stations or in its yards.

The failure on the part of a railroad company, as in this instance, to repair defective equipment, as to the existence of which the company had had knowledge for the space of 12 days, during which time such car had been moved from one place to another, from time to time, on its tracks, indicates that it was unmindful of the duty imposed upon it by the statute.

We are therefore of the opinion that the conduct of the railroad in moving its car from Seventeenth Street to Broad Street and placing it on the side track where, from the very nature of things, it was required to be moved frequently; and this, coupled with the failure on the part of the railroad company to make the needed repairs until it was moved back to Seventeenth Street, 12 days thereafter, was a violation of the act under which this suit was instituted.

For the reasons stated, we are of opinion that the court below erred in directing a verdict in favor of the defendant on the first count. Therefore the judgment of the lower court is reversed.

Reversed.