LEONARD R. RUSH v. FRANK A. THOMPSON, Trustee of and for ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—No. 39851.—202 S. W. (2d) 800.

Court en Banc, May 12, 1947.

Rehearing Denied, June 9, 1947.

*M. G. Roberts, E. G. Nahler, Thos. E. Deacy* and *Milligan, Kimberly & Deacy* for appellant.

*Ben W. Swofford, Robert L. Jackson, Ronald Shankland* and *Swofford, Jackson & Shankland* for respondent.

572

 BOHLING, C.—Frank A. Thompson, Trustee of and for St. Louis-San Francisco Railway Company, a corporation, prosecutes this appeal from a judgment awarding Leonard R. Rush $15,000 damages for personal injuries. Plaintiff predicated defendant's liability upon the ground his injuries were proximately caused by reason of a car used upon defendant's line being equipped with inefficient hand brakes, in violation of Title 45, Chapter I, Sec. 11, U. S. C. A., the Safety Appliance Act. Defendant contends (1) plaintiff failed to make a submissible case in that plaintiff did not make a case of common law negligence and defendant was not liable under the Act because not acting as a common carrier, the car was not being used upon defendant's line at the time, plaintiff was not entitled to the protection of the Act, there was no substaintial evidence the brakes were inefficient and, if so, there was no substantial evidence of the inefficiency constituting a proximate cause of plaintiff's injuries; (2) that the court erred in refusing requested instructions; and (3) that the verdict was excessive.

Plaintiff, an employee of the Quartermaster's Department of the United States Army on the Government reservation at Fort Leonard Wood, Missouri, was injured February 23, 1943, about 8:30 A. M., while unloading coal on the switch track known as the coal spur from a hopper bottom railroad car onto a conveyor over which the car had been spotted when it was struck by Wabash car No. 34174.

The main line of defendant's railroad extends from St. Louis, Missouri, southwestwardly through Springfield to points in Oklahoma and Texas. At Newburg, about 119 miles northeast of Springfield, defendant maintained a division point, a maintenance department and terminal facilities. A Government owned railroad track, about 19 or 20 miles in length with its switch and spur tracks, was constructed to furnish service to Fort Leonard Wood during World War II, and connected with defendant railroad at Bundy Junction, 3 miles southwest of Newburg. A contract (entered into by defendant's predecessors) was in force and effect with the Government at the time of plaintiff's injuries with covenants to the following effect:

"WHEREAS, Government has heretofore constructed and now owns certain railroad facilities at Fort Leonard Wood, Missouri, including trackage extending from Bundy Junction, Missouri, to Fort Leonard Wood, Missouri, and has requested, and does hereby request, Trustees to maintain and operate said facilities and trackage with their own equipment and crews for the purpose of furnishing Government freight and passenger or troop train service between Newburg, Missouri, and Fort Leonard Wood, Missouri, including switching at the latter point, which Trustees are willing to do upon the following terms and conditions;

NOW THEREFORE, in consideration of the premises it is agreed as follows:

1. Solely for the purposes herein contemplated, Government hereby grants to Trustees, during the term hereof, the exclusive right to operate their engines, trains and cars upon the railroad tracks of Government between Bundy Junction, Missouri, and Fort Leonard Wood, Missouri, and points intermediate thereto. Trustees shall not perform any common carrier service over said railroad tracks of Government."

The Trustees agreed to furnish the Government freight train service and passenger or troop train service between Newburg and Fort Leonard Wood and switching service within said Fort at a specified rate for each eight-hour crew shift, or fraction thereof, for the particular service rendered. The Trustees were to furnish all labor for and perform the ordinary maintenance of the Government railroad facilities at a cost not to exceed a stated amount, the Government undertaking to furnish the needed material, supplies, tools et cetera. The Government agreed to save the Trustees harmless on account of claims for personal injury or death to Government personnel, including selectees, lawfully traveling on trains so operated by the Trustees. The Trustees agreed to save the Government harmless on account of any other claim for personal injury or death "resulting from or caused by any act or omission of Trustees, their agents, servants or employees, or otherwise, in the operation or maintenance by Trustees of Govern-

ment's or Trustees' said railroad facilities or any part thereof.'' The Government agreed to pay demurrage in accordance with applicable demurrage tariffs. The contract could be cancelled by either party on 30 days' notice. Other provisions need not be stated here.

Defendant, in the performance of this contract, made up trains at Newburg, generally at night and used its crews and locomotives to haul them into and out of Fort Leonard Wood. A. J. Lewis was Government Yardmaster at the Fort. The coal cars would be spotted for unloading by defendant's employees according to instructions emanating from his office. Don Schaffner was foreman of the men engaged in unloading the coal on the spur track at the time plaintiff was injured. After defendant's employees spotted the cars on the coal spur defendant had nothing further to do with them until they were unloaded by Government employees, when the empty cars would be picked up and returned to Newburg by defendant's crews and engines.

Noble T. Overly, an assistant superintendent of defendant, was stationed at Fort Leonard Wood and had supervision over the maintenance and operation of all the trackage in the Fort. Defendant inspected the cars destined to the Fort for defects at Newburg prior to moving them into the Fort, maintaining a car department for the purpose of making the necessary repairs; and in connection with that department had an employee who inspected the cars daily in the yards at the Fort and who made minor repairs there.

So far as here involved, the main tracks extended north and south. The coal spur track was 956 feet long, extending north of the main track and ending in a dead end. Opposite and west of the main track was the ''Tobin'' switch, upon which cars were stored at times. The coal spur had a very uniform descending grade to the north of .7 of 1%. About 100 feet north of the main track was a railroad-highway (truck) crossing and a conveyor pit was located 763 feet north of the main track. Coal cars were unloaded on the coal spur by means of a Diesel crane if a flat car, but if the cars were equipped with hopper bottoms, the car would be spotted above the conveyor, the hoppers opened, and the coal permitted to flow out by gravity onto the conveyor. It was customary for a number of cars to be spotted on the spur south of the conveyor for unloading. The loaded cars would be moved one at a time by Government employees under Schaffner to the conveyor for unloading and then to the north. When the car over the conveyor was about unloaded, a loaded car would be brought to within 6 to 12 feet of it; and when unloaded, the empty would be rolled north of the conveyor and the loaded car moved over the conveyor. There was testimony that at times, say when the empty had a flat wheel or the track around the conveyor was jammed with coal, the loaded car would be started down the grade and permitted to bump the empty to the north of the conveyor. At times the Diesel crane was used to move the cars.

When plaintiff reported for work on the morning he was injured there were no loaded cars on the coal spur and the men cleaned the loose coal from around the conveyor and the track over the conveyor. Loaded cars were moved in on the coal spur and plaintiff and one McCoy moved a hopper car that had been half unloaded the day before over the conveyor. ▮ This was done by hand switching. All of the coal would not empty out of the cars by gravity. So, after the coal which would run out freely had emptied, men would enter the car, stand on the floor, hold onto the edge of the car with one hand and push the remaining coal out with a shovel in the other hand to completely empty the car. Their heads and shoulders would be above the sides of the car while doing this. This method required approximately 5 to 10 minutes to empty a car. Plaintiff and McCoy entered the car over the conveyor to empty it. The next car for movement over the conveyor and about 100 feet south of the conveyor was Wabash car No. 34174. This car, loaded with coal, originated at Mount Olive, Illinois, and was destined to Fort Leonard Wood. It arrived at Newburg, via defendant-railroad, February 19, 1943, was hauled to the Fort February 20,1943, and placed on the Tobin track where it remained until February 23rd, when it was moved to the coal spur. Alex Steele, who moved the cars in the absence of the foreman, proceeded with two men to the Wabash car. It was uncoupled from the cars to the south. Steele mounted the car to man the hand brake, which was at the south end of the car, fartherest from the conveyor. He could not recall whether he had to loosen the brake. The man on the ground started the car rolling north. All the coal had not gone out of the car over the conveyor at the time and plaintiff was still standing in the car, holding with his left hand onto the side near the south end and using his shovel to empty it. Steele shouted a general warning "look out" when the Wabash car started north. About this time McCoy got out of the car. Steele intended to stop the Wabash car about 6 to 12 feet south of the car on the conveyor. The car attained a speed of about 4 miles an hour. Steele applied the brake, turning the wheel with all his strength, but it had no effect upon the speed of the car. The conveyor made a great deal of noise when in operation. Apparently plaintiff did not hear Steele's warning and continued his unloading of the car. Finished, he was in the act of throwing his shovel out when he heard a warning. He looked south and saw the Wabash car 8 or 10 feet away. He grabbed hold of the end of the car he had been unloading with both hands. The cars collided and caused plaintiff to lose his hold, fall, and be injured.

Usually when the empty car was "bumped" from over the conveyor, the first hopper of the loaded car would stop beyond the conveyor and it would have to be moved back. There was evidence that the crane, with the brakes set, was three car lengths north of the conveyor

pit; and that in this instance the empty car and the loaded car were stopped by it, the loaded car being about 50 feet north of or beyond the conveyor. Don Schaffner, the foreman, thinking Steele had possibly failed in his duty and wanting to be sure, proceeded to test the brake on the loaded car. The brake wheel was set and he was unable to tighten it any tighter. It was necessary to roll the loaded car over the conveyor, and with the brake wheel set tight, the wheels rolled freely. Other facts will be stated in connection with the issues discussed.

Counsel say plaintiff made no submissible case under common law negligence. Plaintiff predicated his recovery solely upon the jury finding defendant liable under Sec. 11 of the Safety Appliance Act, Title 45 of the United States Code, which reads in part:

"It shall be unlawful for any common carrier subject to the provisions of sections 1-16 of this title to haul, or. permit to be hauled or used on its line, any car subject to the provisions of said sections not equipped with appliances provided for in sections 11-16 of this title, to wit: All cars must be equipped with . . . efficient hand brakes . . ." (Tit. 45, U. S. C. A. Sec. 11) The words "this Act" appear in lieu of "sections 1-16 of this title" in the Act of Congress of April 14, 1910. 36 U. S. Stat. p. 298, Sec. 2.

 Speaking to the obligation existing under the Safety Appliance Act, the United States Supreme Court said in Brady v. Terminal Rd. Ass'n. of St. Louis, 303 U. S. 10, 15, 58 Sup. Ct. 426, 82 L. Ed. 614: "The statutory liability is not based upon the carriers negligence. The duty imposed is an absolute one, and the carrier is not excused by any showing of care, however assiduous." See Roberts, Federal Liabilities of Carriers (1929) p. 1253, secs. 656-668. Negligence in the ordinary sense of a want of care is not the basis of liability under this and similar Federal statutes. Lilly v. Grand Trunk Western R. Co., 317 U. S. 481, 485, 63 S. Ct. 347, 87 L. Ed. 411; Cantley v. Missouri-Kan.-Tex. R. Co., 353 Mo. 605, 615, 183 S. W. 2d 123, 126[2]. Noncompliance with the Safety Appliance Act "is a wrongful act" giving rise to liability; the legislative intent being to treat noncomformity "as 'negligence,'—what is sometimes called negligence *per se*." San Antonio & A. P. R. Co. v. Wagner, 241 U. S. 476, 484, 36 Sup. Ct. 626, 630, 60 L. Ed. 1110, 1117.

 Counsel contend that at the time of plaintiff's injuries defendant was not acting as a common carrier and was not hauling or permitting to be hauled or used on its line Wabash car No. 34174 and, therefore, plaintiff may not recover under the Safety Appliance Act.

On the common carrier feature of the issue. In addition to the testimony establishing that defendant's railroad extended into several states and that Wabash car No. 34174 was received and moved by defendant in interstate commerce, we may take judicial notice of the fact that defendant is a common carrier engaged in interstate com-

merce. State v. Missouri Pac. R. Co. (Banc), 212 Mo. 658, 676(a), 111 S. W. 500, 504(a); Spaw v. Kansas City Term. R. Co., 198 Mo. App. 552, 201 S. W. 927.

The original Safety Appliance Act of March 2, 1893 (27 U. S. Stat. 521) was entitled "An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with . ... , and for other purposes." It did not define terms. It was amended April 1, 1896. (29 U. S. Stat. 85). The Act of March 2, 1903 (32 U. S. Stat. 943, Ch. 976) declared that specified provisions of the Safety Appliance acts "shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, . . . and to all other locomotives, tenders, cars and similar vehicles used in connection therewith," exempting certain equipment immaterial here. The section (quoted supra) upon which plaintiff's cause of action is based is Sec. 2 of the Act of April 14, 1910, the stated purpose of which was "to supplement" the previously mentioned Acts and which was explicitly made applicable "to every common carrier and every vehicle" subject to the Acts so supplemented. Sections 1-16 of Title 45 of the United States Code apply in express terms to "any common carrier engaged in interstate commerce by railroad." Sec. 1 of Tit. 45, U. S. C. See Sec. 16, Id.

Defendant was a common carrier within the scope of the Safety Appliance Act under the foregoing enactments of the Congress. Southern R. Co. v. United States, 222 U. S. 20, 25, 32 Sup. Ct. 2, 56 L. Ed. 72. Adjudications hold the Act applicable, for instance, to "bad order" cars being taken to the shops for repair; cars out of the common carrier service at the time involved. See, among others, Texas & Pac. R. Co. v. Rigsby, 241 U. S. 33, 36 Sup. Ct. 482, 60 L. Ed. 874; United States v. Chesapeake & O. R. Co., 213 Fed. 748, 749[1], 130 C. C. A. 262, 263[1]. Terminal companies owning no rolling stock but engaged in furnishing passenger depot facilities and services for use by interstate railroads are common carriers under the Federal Employers' Liability Act (45 U. S. C. A. Sec. 51 et seq.) McCabe v. Boston Terminal Co., 303 Mass. 450, 454, 22 N. E. 2d 33, 36[7] citing cases, 309 U. S. 624, 84 L. Ed. 986, 60 S. Ct. 725. See also United States v. Brooklyn Eastern Dist. Term., 249 U. S. 296, 39 S. Ct. 283, 63 L. Ed. 613, 6 A. L. R. 527; Cott v. Erie R. Co., 231 N. Y. 67, 131 N. E. 737, 738[2, 3] Defendant's covenant with the Government not to perform common carrier service over said railroad track is not determinative of plaintiff's rights, as defendant, if otherwise liable under the Act, can not defeat its provisions by contract with third parties. Philadelphia & R. R. Co. v. United States, 191 Fed. 1, 4. Pennsylvania R. Co. v. Pittsburg L. & W. R. Co., 83 Fed. 2d 861, stressed by defendant, involved the operation by a private industry of its railroad solely for its industrial

purposes and the applicability of the Interstate Commerce Act (49 U. S. C. A. Sec. 1(3)) and is distinguishable on the facts.

Wabash car No. 34174 was being "used on" defendant's "line" within the meaning of the Safety Appliance Act.

Although the Government constructed the railroad tracks, it had no engines or rolling stock or crews or inspectors or repairmen to operate and was not operating thereover. Defendant had the exclusive right to operate all freight, passenger, and switching services to be rendered over said tracks and had control over the maintenance of said tracks and was charged with and covenanted to be responsible for the inspection and maintenance and repair of all the rolling stock moving over said tracks, agreeing to save the Government harmless from all claims for injuries or death of persons "resulting from or caused by any act or omission of" defendant "in the operation or maintenance by Trustees of Government's or Trustees' said railroad facilities or any part thereof," with the exception of claims not here material. The Government assumed no obilgation with respect to the inspection, maintenance or repair of any car or the reimbursement of defendant therefor. It was within the contemplation of the contracting parties, with defendant furnishing freight, passenger, and switching services between Newburg and the Fort and over the Government tracks to the exclusion of all others, that cars moved into the Fort by defendant would be moved out of the Fort by defendant for the further service of the railroad. So, the movement of the cars into the Fort was not a completed movement under the contract until they were again moved out of the Fort to Bundy Junction and then over defendant's owned and operated track for 3 miles to Newburg. The Government's track became a part of defendant's line of railroad; i. e., a railroad engaged in interstate commerce, facilitating the rendition of common carrier service by defendant to the Government and to the general public having occasion to use defendant's services in the transaction of business with the Government; and Wabash car No. 34174 was a car used on defendant's "line" in said service at the time of plaintiff's injury. Consult Felt v. Denver & R. G. R. Co., 48 Colo. 249, 110 Pac. 215, 1136, 21 Am. & Eng. Ann. Cas. 379; Bresky v. Minneapolis & St. L. R. Co., 115 Minn. 386, 132 N. W. 337, 338[4]; Wheeling Term. R. Co. v. Russell, 209 Fed. 795, 797[2], 126 C. C. A. 519; Beam v. Baltimore & O. R. Co. (Ohio Ct. Apps.), 68 N. E. 2d 159, 163[3].

In Gray v. Louisville & N. R. Co., 197 Fed. 874, 875[2] a switchman's death on a private industry track was occasioned by a defective coupler. The loaded car had moved interstate to the point of destination before it was damaged. It was then moved to the consignee's private spur track and unloaded. The accident occurred while the switching crew was undertaking to move the car from the private spur to the railroad's yards for repair. The court held the private spur

track a part of the defendant-railroad's line and the car in use thereon and subject to the Safety Appliance Act, the railroad being considered rightfully using the spur. See Lovett v. Kansas City Term. R. Co., 316 Mo. 1246, 1254(II), 295 S. W. 89, 92[4].

In Brady v. Wabash R. Co., 329 Mo. 1123, 49 S. W. (2d) 24, 287 U. S. 619, 77 L. Ed. 538, 53 S. Ct. 20, stressed on this issue by defendant, a Terminal Railroad Association placed a car with a defective grab iron along with other cars on a connecting track owned by the Wabash for delivery to the Wabash. The Wabash directed plaintiff and another car inspector, employees of the Wabash, to inspect the cars placed on the connecting track to determine whether they complied with the Safety Appliance Act et cetera and were to be received in service. Plaintiff was injuried while conducting this inspection. The court held the car had not been accepted by the Wabash and was not being hauled or permitted to be hauled or used on its line at the time of the injury. Certiorari to review this ruling was denied by the United States Supreme Court. Brady next sued the Terminal Railroad Association (see Brady v. Terminal R. Ass'n., 303 U. S. 10, 13, 14, 58 Sup. Ct. 426, 82 L. Ed. 614, overruling 340 Mo. 841, 102 S. W. 2d 903), and the United States Supreme Court said in holding the Terminal liable: "The car in this instance had not been withdrawn from use. . . . The car was still in use, though motionless. . . . In view of that use, either the Terminal Association or the Wabash was subject to the obligation imposed by the statute. . . . [After pointing out that plaintiff was inspecting the car to determine whether the Wabash would assume control and that it had not accepted or assumed control, the court continued:] As the car had not been withdrawn from use and was still in the possession of the Terminal Association, its statutory obligation continued . . . " See also Fort Street Union Depot Co. v. Hillen, 119 Fed. 2d 307, 312[13] and cases cited; Hood v. Baltimore & O. R. Co., 302 Mo. 609, 621(IV), 259 S. W. 471, 475[6]; Tyon v. Wabash R. Co., 207 Mo. App. 322, 337(II), 232 S. W. 786, 790[4-6]. The Safety Appliance Act requires the use of power brakes under the control of the engineer in the operation of trains and contemplates that it will not be necessary to use hand brakes for that purpose. See Tit. 45 U. S. C., Secs. 1, 9; Page v. Payne, 293 Mo. 600, 240 S. W. 156. Hand brakes are for use primarily in switching and other like operations. Loaded cars have to be unloaded at destinations to make them available for further service. Defendant's crew spotted Wabash car No. 34174 on the coal spur a few minutes prior to plaintiff's injuries. Defendant knew it would be unloaded that the empty might be returned by defendant to Newburg and that it would be placed over the conveyor by the Government employees hand switching the car and the hand brake used by them in connection with that movement. Defendant and defendant alone was responsible for and had full con-

580

trol of the maintenance of the rolling stock to conform with the requirements of the Safety Appliance Act. It had accepted Wabash car No. 34174 and hauled it on its line to the coal spur track. The car was in use; it had not been withdrawn from service. It was not taken out of but remained in defendant's use for the purposes of its proper maintenance under the Safety Appliance Act by defendant while being moved for the purpose of unloading and the return of the empty car to Newburg by defendant. The point is ruled against defendant.

 The primary purpose of the Act may be, as contended by defendant, for the protection of employees and travelers upon railroads but that is not the full ambit of the purpose of the Safety Appliance Acts and defendant's contention that plaintiff, a Government employee engaged in unloading coal, may not recover under the Act because not within its protection is overruled, because: The portion of the title of the original Act material here reads: "An Act to promote the safety of employees and travelers upon railroads . . . , and for other purposes." 27 U. S. Stat. 531. Thus, the title of the Act extends its provisions beyond the protection of "employees and travelers upon railroads." In Fairport, P. & E. R. Co. v. Meredith, 292 U. S. 589, 596, 54 S. Ct. 826, 78 L. Ed. 1446, an autoist recovered for injuries sustained at a railroad-highway crossing in a collision between a train and the automobile occasioned by a failure of defendant to have the power brakes maintained, connected, and used as required by the Safety Appliance Act. The court refused to impute to Congress when specifically promoting the safety of employees and passengers on railroads an intention to repudiate the safety of travelers at highway crossings whose safety was likewise promoted; stating: "Since all of these three classes of persons are within the mischief at which the provisions are aimed, it is quite reasonable to interpret the statute imposing the duty as including all of them." So too in the instant case, efficient hand brakes promote the safety of those who have to move coal cars on spur tracks for the purpose of unloading them as well as the safety of the employees of the railroad. Brady was not an employee of the defendant in Brady v. Terminal R. Ass'n., 303 U. S. 10, 14, 58 S. Ct. 426, 82 L Ed. 614. Consult Fort Street Union Depot Co. v. Hillen, 110 Fed. 2d 307, 312[18].

 We are unable to agree with defendant's point that there was no submissible evidence of the brake on Wabash car No. 34174 being inefficient.

"There are two recognized methods of showing the inefficiency of hand brake equipment. Evidence may be adduced to establish some particular defect, or the same inefficiency may be established by showing a failure to function, when operated with due care, in the normal, natural, and usual manner. . . . Assuming the proper setting of

the brake, the fact that it did not hold demonstrates its inefficiency." Didinger v. Pennsylvania R. Co., 39 Fed. 2d 798, 799[3 et seq.] Colwell v. St. Louis-S. F. R. Co., 335 Mo. 494, 503, 73 S. W. 2d 222, 226[3].

Plaintiff made a case under the second method. Steele, who manned the brake in the absence of the foreman, testified that at the time he had operated about 25 cars with that type of brake; that he intended to stop the car when within 6 to 10 feet of the car plaintiff was in; that "when the car I was on started rolling" he saw Mr. Rush and called out a warning and "after I gave this warning, I got down on the brake to stop it and when I did this, the brake, it would not hold." The car was approximately 100 feet from plaintiff and attained a speed of about as fast as a man would walk. Steele testified he applied the brake in the manner he applied it on other cars; that he tightened this brake as far as it would go; that what he did had stopped the other cars but this car seemed to go as fast as ever and bumped the car plaintiff was in. The foreman tested the brake after the accident and found it was as tight as could be but that the wheels rolled freely when they moved the car back onto the conveyor with the brake still tight. This was sufficient. The jury could readily infer that had this brake functioned as the brakes on other cars, the car would have stopped before the collision. Plaintiff might have been more specific with respect to the distances when full braking power was applied, but certainly it can be inferred from this record that it was applied before the cars collided. The fact that the wheels on Wabash car No. 34174 rolled freely with the brake tight after the accident established that no matter how efficient the manning of the brake might have been it would not have stopped the car.

■ Defendant claims the defective hand brake was not a proximate cause of plaintiff's injuries but that his injuries were caused solely by the negligence of his fellow employees as a matter of law. The facts need not be repeated. Under instructions given at defendant's request the jury found that plaintiff's injuries were not caused solely by the submitted negligence of plaintiff's fellow employees and also that they were not directly contributed to by negligence on the part of plaintiff. The only other causative factor under the record was the inefficient hand brake. The facts fully warranted the finding that this safety appliance, the hand brake, failed to function in the manner and for the purpose it was intended in promoting the safety of those within the protection of the Act; that is, the prevention of a collision between the Wabash car and the car plaintiff was in. In these circumstances the failure of the hand brake to function caused the ensuing collision to be a natural, probable, and foreseeable consequence of its failure to stop the Wabash car—its inefficiency becoming a proximate cause of plaintiff's injuries. Swinson v. Chicago, St. P., M. & O. R. Co., 294 U. S. 529, 55 S. Ct. 517, 79

L. Ed. 1041, 96 A. L. R.· 1136; Davis v. Wolfe, 263 U. S. 239, 244, 44 S. Ct. 64, 66[3], 68 L.· Ed. 284 (affirming 294 Mo. 170, 185(III), 241 S. W. 915, .919[4]) and cases cited; Minneapolis, St. P. & S. Ste. M. R. Co. v. Goneau, 269 U. S. 406, 410, 46 S. Ct. 129, 131[4], 70 L. Ed. 335; Cusson v. Canadian Pac. R. Co., 115 Fed. 2d 430, 432[3]; Keenan v. Director General of Railroads, 285 Fed. 286, 289[2]; Kimberling v. Wabash R. Co., 337 Mo. 702, 714, 85 S. W. 2d 736, 740[6], and cases cited; Truesdale v. Wheelock, 335 Mo. 924, 935[3], 74 S. W. 2d 585, 591 [6-8]. Defendant's cases are distinguishable in that the safety appliance was used or relied upon for a purpose for which it was not intended or naturally or usually put, or (as stated in Davis v. Wolfe, supra) the failure of the appliance created "an incidental condition or situation in which the accident, otherwise caused, results ▇ in such injury." Lang v. New York C. R. Co., 255 U. S. 455, 41 S. Ct. 381, 65 L. Ed. 729; St. Louis & S. F. R. Co. v. Conarty, 238 U. S. 243, 35 S. Ct. 785, 59 L. Ed. 1290; Davis v. Hand, 290 Fed. 73; Reetz v. Chicago & E. R. Co., 46 Fed. 2d 50.

Error is claimed in the refusal of Instruction No. 16, reading: "The court instructs the jury that if you find and believe from the evidence that the Wabash car mentioned in evidence was not being hauled ·or permitted to be hauled, or used on the line of railroad of defendant, at the time of plaintiff's alleged injury, and that the defendant in transporting coal cars from Bundy Junction to Fort Leonard Wood, and in switching coal cars from one point to another, including the coal car mentioned in evidence, in Fort Leonard Wood was not acting as a common carrier, then your verdict must be for the defendant."

The instruction is subject to the criticism that it is abstract in nature and gives the jury a roving commission to determine what constitutes, for instance, a "common carrier engaged in interstate commence" within the Safety Appliance Act and what constitutes permitting a car to be used or using a car "on its line"·by such a carrier in violation of said Act. It is subject to the criticism leveled against instructions in Boland v. St. Louis-S. ·F. Ry. Co. (Mo.), 284 S. W. 141,·145[11]; Long v. Mild, 347 Mo. 1002, 1013, 149 S. W. 2d 853, 960[16]; Macklin v. Fogel Const. Co., 326 Mo. 38, 50, 31 S. W. 2d 14, 19[18]. We also understand that the Safety Appliance Act applies to all cars "used on ·any railroad engaged in interstate commerce . . ,. and to all other . . . cars . . . used in connection therewith." See 32 U. S. Stat. 943. The instruction appears a bit restrictive on the scope of the Act.

Complaint is made in general terms of the refusal of an instruction which predicated a defendant's verdict on a finding of contributory negligence. A sufficient reason for its refusal was that a given instruction covered the issue and was much more favorable to defendant than the refused instruction. Edwards v. Woods, 342

Mo. 1097, 1103[2], 119 S. W. 2d 359, 361[5]; De Moulin v. Roetheli, 354 Mo. 425, 189 S. ·W. 2d 562, 567[10].

█ Is the $15,000 judgment excessive?

The issue calls for a consideration of the evidence favorable to plaintiff. Plaintiff was about 51 years of age, owned a farm of 116 acres, and had performed hard manual labor all his life; farm work, work at saw mills, in coal mines, et cetera. A witness described him as active mentally. The collision caused plaintiff to fall to the ground, strike his head and back on the couplings, rails, and ties. He was made unconscious. Witness Miller pulled plaintiff out from underneath the side of the car to save him from further injury. He was taken to the hospital at the Fort, where he regained consciousness in the afternoon. His condition was diagnosed as a cerebral concussion, considered moderately severe, a possible skull fracture, left posterior neck and left lumbar back sprain, and laceration on left ear. He remained in the hospital three weeks, was then moved to his home where he stayed about ten days before reporting at the Fort. He was not able to do anything for a month, could not be up all the time. He started checking the load on the trucks but was later transferred to a janitor's job. He could not sweep because of his back and therefore did the lighter janitor work. He continued in this up to April 10, 1945. An attempt after several months to return to shoveling coal resulted in hospitalization on account of his back. Plaintiff testified that when he first went to the hospital he suffered severe pains in his head, neck, and the small of his back; that he could not move around in bed for a few days but later he could sit up and get around in a wheel chair. The trial was in November, 1945, and he still suffered headaches every day, some days more severe than others; and a spot in his back pained him constantly and at other times the pain spread to other parts of his back. At times he becomes weak, faint and dizzy. He cannot see as good as before the accident. On occasions he has tried to do heavier work but cannot lift and cannot stand much physical exertion. He is unable to do any heavy physical labor, █ including farm work. This testimony was corroborated by other witnesses. There was testimony that before the accident he was good help on the farm but that subsequent thereto he could not put up hay, split rails, or drive posts; that he was "shaky," would stagger and at times fall over and. had developed a tremor in his hands which was becoming worse, and that his memory and speech had been affected.

Dr. Ralph E. Mueller, an orthopedic surgeon of Kansas City, examined plaintiff in October, 1944. He found no broken bones but muscle spasms in plaintiff's neck and lower back, lumbar region, and plaintiff complained of pain. Lateral bending of plaintiff's spine to the left and right was limited 15 to 20 per cent. Plaintiff had a congenital malformation of the spine, causing weakness and instability

and possibly affecting recovery from injury or preventing it. His opinion was that plaintiff's disability in the back was permanent.

Dr. A. L. Skoog, a neurologist of Kansas City, examined plaintiff in October, 1944, in June, 1945, and again before testifying. His examinations disclosed that plaintiff had had trouble within the cranium; that he had a great deal of tongue tremor (shaking) and the same tremor in his hands; that his reflexes were sluggish, and he had muscle spasms or rigidity involving all muscles of the body. He testified plaintiff had multiple lesions in the brain, attributable to his injury in the collision of February, 1943; that when nerve fibers in the brain or spinal cord are injured, they can never be repaired as skin or bone lesions; that in his opinion plaintiff's condition had become worse; that it was permanent, plaintiff would never recover and he could not perform hard labor.

Defendant relies on Turner v. Central Hdwe. Co., 353 Mo. 1182, 186 S. W. 2d 603, and Taylor v. Lumaghi Coal Co., 352 Mo. 1212, 181 S. W. 2d 536, cases wherein judgments for $15,000 were considered excessive by $5,000. The verdict may appear large; but accepting that testimony favorable to plaintiff with respect to the severity, duration, and incapacitating effect of his injuries and with judicial knowledge of the value of today's dollar, defendant's authorities do not establish error. See the cases involving somewhat similar factual situations in Brady v. Terminal R. Ass'n., 344 Mo. 502, 127 S. W. 2d 1. Consult also Dell v. Schaefer Cons. Co. (Mo.), 29 S. W. 2d 76, 78[5]; De Moulin v. Roetheli, 354 Mo. 425, 189 S. W. 2d 562, 567 [14]; Hoff v. Wabash Ry. Co. (Mo.), 254 S. W. 874, 878[6].

The judgment is affirmed.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the Court en Banc. *Douglas, Hyde* and *Leedy, JJ.,* and *Tipton, C. J.,* concur. *Conkling, Clark* and *Ellison, JJ.,* dissent.