ROBERT RISBERG v. DULUTH, MISSABE & IRON RANGE RAILWAY COMPANY.[1,2]

March 22, 1951.

No. 35,263.

---

[1]Reported in 47 N. W. (2d) 113.
[2]Certiorari denied by U. S. Supreme Court October 16, 1951.

*Louisell & Louisell* and *David W. Louisell,* for appellant.
*W. O. Bissonett* and *William H. Crago,* for respondent.

MAGNEY, JUSTICE.

The Zenith Dredge Company owns and operates a large rock quarry near the Duluth steel plant district. A network of railroad tracks is laid out on its property. The total length of these tracks is about three miles. This system connects up with the tracks of the Duluth, Missabe & Iron Range Railway Company, the defendant herein, an interstate carrier, at a station called Brewer. The quarry is equipped with a steam locomotive and a self-propelling diesel-powered locomotive crane. The crane handles the cars in the area within the pit, while the steam locomotive handles the cars between the lower yard and the pit. The crane is so constructed that it travels on steel rails under its own power. It is equipped with a coupling so that it can move railroad cars as required. Its boom is 55 or 60 feet long with cables running through it. At the end of the cables is a grapple clam with four prongs that close like fingers of the hand and is able to pick up pieces of rock weighing several tons. The clam is operated from the cab of the crane.

All the cars used on the tracks of the quarry company are moved by the locomotive or the crane or by gravity. The empty cars are delivered by defendant to the tracks of the quarry company. After the cars have been loaded with rock, they are taken down to the lower yard by the quarry company's locomotive and there turned over to defendant for ultimate delivery. At the time

of the accident to plaintiff, an employe of the quarry company, the company was supplying rock of various sizes for the construction of a breakwater at Two Harbors, Minnesota. Three sizes of rock were furnished—skip rock, which consists of small rocks up to one ton, grapple rock, 1 to 5 tons, and cover rock, 5 to 30 tons. The skip rock was loaded in a metal skip or bucket, 3 or 4 of which were put on each car. The loaded cars of rock were being transported by defendant over a route entirely within the state of Minnesota on its own tracks and, for a short distance, on the tracks of the Northern Pacific Railway Company. One hundred fifty 30- and 40-ton flatcars about 40 feet long, specially equipped for the purpose, were used by defendant in this rock-hauling enterprise. These cars had special beams or timbers along the sides and ends which were 12 inches high and 6 inches wide. At the brake end of the car, the beam was set in from the edge about 1 foot, making a sort of brake platform. While the cars were in the possession of the quarry company, it had at times made some repairs on brake shafts, chains, and air hose. No repairs were ever made on brake shoes. Plaintiff's counsel made an offer of proof that at times the brakes on some of these cars had failed to work. There was no direct evidence introduced to show the cause of such brake failures, but there was testimony to the effect that small rocks, snow, and ice sometimes accumulated outside the beam and the brake ledge or platform and around the brake staff.

Among the tracks in the quarry pit itself was one designated as the north track and another as the south track. They were parallel to each other.

On December 10, 1947, defendant delivered a number of its empty 30- and 40-ton flatcars to the quarry. One of these cars was the 30-ton car No. 6286. At four o'clock in the afternoon of December 12, 1947, a crew composed of Paul Long, crane operator, Lloyd Sunnarborg, oiler, and Robert Risberg, brakeman, plaintiff herein, arrived at the quarry. Their shift was from

4 to 12. The day crew had left early because of snowy weather. When this crew went to work, there were three cars of skip rock spotted on the west end of the above-mentioned south track. There were 17 empty cars on the north track. In loading the cars that afternoon and evening, Long would take three or four empties, spot them on the north track with his crane, then run up to the east switch and back onto the south track, where he would proceed to load these spotted cars with grapple rock. After these cars were loaded, the crane would move back to the east switch, return over the north track, couple onto the loaded cars, push them back against the empties, hook on three or four empties, and pull them into position for loading. Then the loaded cars would be uncoupled and pulled over the east switch and pushed back along the south track until they coupled onto the loaded cars already spotted on the south track. The crane would then return to load some more cars with grapple rock. The evidence clearly establishes that this operation was carried on until 15 cars had been loaded and spotted on the west end of the south track. The movement of all of these cars had been handled with the crane.

Two empty cars remained. These were pushed into a spur to the north of the so-called north track. This spur track runs upgrade, and when the cars had been pushed in on this track the brake was set on the lead car. After these cars had been spotted on the spur track, Long proceeded to load the car nearest the crane. After it had been loaded with cover rock, four or five to the load, the crane coupled onto the car and moved it about 6 or 8 feet beyond the east switch. Plaintiff rode on the west end of the car, and when it had passed over the switch he went over and turned the switch. The track to the east of the switch point had over a 3-percent grade and the track to the west a 1.92-percent grade. In order to pull or free the pin of the drawbar because of the gravity pull on the grade, the crane put on enough power to give slack to the coupling. Sunnarborg pulled

the pin. Plaintiff got on at the west end while the car was standing still. He had a brake club or pick handle, 30 to 36 inches long, in his hand when he climbed up on the car. He placed one foot inside the body of the car and the other on the brake platform, straddling the timber. He then proceeded to take out the slack by hand. After that, he put the brake club through the brake wheel to pull up the notches on the rachet wheel at the bottom of the brake so as to have the dog hold the brake in position, thus preventing slipping. By the use of the brake club, he ran up four or five notches, and was still pulling the rod to get another notch or two. The car kept going faster, gaining speed all the way. The brake had no effect on the car. Plaintiff saw nothing wrong with the brake wheel or brake staff. Ordinarily, by the use of the brake club, cars would be taken down at the speed of a slow walk. Plaintiff did not remember how many feet the car had gone by the time he had taken up the slack. It had not gone a car length before he inserted the brake club between the spokes. The car ran about 380 feet when it struck the other loaded cars. His leg was caught between a cover rock and the timber and badly injured. Cover rocks were always loaded three feet from the timber so as to give clearance for the men operating the brakes. Probably the rock nearest the timber had pitched forward because of the jolt. After the accident, the distance from the rock to the timber was about 8 inches, and a dent in the timber indicated that the rock had struck it. The car on which plaintiff was riding left the quarry on December 13, 1947.

At the time of the accident, car No. 6286, the one in question, had a gross weight of 108,400 pounds. The tare weight was 41,200 pounds, and the net weight 67,200 pounds. It was overloaded to the extent of 5,400 pounds. Cars overloaded more than five tons would not be permitted to leave the quarry company's property.

■ Upon the above facts, perhaps unnecessarily detailed, the court directed a verdict for defendant on the ground that the Federal Safety Appliance Act (45 USCA, § 1, *et seq.*) did not

apply and that the facts failed to spell out a common-law liability. The Federal Safety Appliance Act provides (45 USCA, § 11):

"It shall be unlawful for any common carrier [engaged in interstate commerce by railroad] * * * to haul, or permit to be hauled or used on its line, any car * * * not equipped with appliances provided for * * * to wit: All cars must be equipped with secure sill steps and efficient hand brakes; * * *."

No showing of due care can defeat an action based upon violation of the act if such violation is the proximate cause of the injury. O'Donnell v. Elgin, J. & E. Ry. Co. 338 U. S. 384, 70 S. Ct. 200, 94 L. ed. 187; Carter v. Atlanta & St. Andrews Bay Ry. Co. 338 U. S. 430, 70 S. Ct. 226, 94 L. ed. 236; Affolder v. New York, C. & St. L. R. Co. 339 U. S. 96, 70 S. Ct. 509, 94 L. ed. 683.

In determining whether the above-cited section of the Federal Safety Appliance Act applies to this case, the following pertinent facts must be considered:

The car with the claimed defective brake was owned by defendant. It was being "hauled" and "used" at the time of the accident on the tracks of the Zenith Dredge Company by the dredge company's crew and engine. It had been in possession of the Zenith Dredge Company for over two days, during which time it had been loaded with large rocks. Plaintiff at the time was an employe of the dredge company.

The wording of the Federal Safety Appliance Act, quoted above, indicates that it is not the ownership of a car with a defective appliance that creates the liability under the statute, but the hauling, permitting to be hauled, and using of such car. To hold defendant liable under the act for this unfortunate accident, it must be on the basis of its ownership of the car with the claimed defective brake and not on the basis of the defendant hauling or using the car on its own line at the time of the accident.

The Zenith Dredge Company is, of course, not a common carrier engaged in interstate commerce. The Federal Safety Appli-

ance Act does not apply to it. Its liability to its employes for injuries growing out of its operation of an engine and cars over its three-mile system of tracks, as well as for other injuries sustained by its employes, is governed by the workmen's compensation act of Minnesota. The primary question to be determined here is whether an employe of the dredge company, injured in his line of duty, may recover under the Federal Safety Appliance Act against defendant, the owner of the car, but who was not hauling or permitting it to be hauled, or using the car with a claimed defective brake on its own line at the time of the accident.

Plaintiff claims that defendant hauled or used the car on its own lines within the meaning of the act, and cites Rush v. Thompson, 356 Mo. 568, 202 S. W. (2d) 800, as an authority to support his position. In that case, defendant was the trustee of a railroad, and will be designated as the railroad. It had received a car of coal with defective brakes from a forwarding railroad. The car was hauled over defendant's tracks and then over government-owned tracks to Fort Leonard Wood, pursuant to an agreement with the United States. It was placed on the government-owned tracks, where it could be spotted by gravity by employes of the army. While this car was being spotted, the hand brake failed to function, causing the car to crash into a previously spotted car which plaintiff, an employe of the government, was unloading on a spur. The Missouri supreme court held the defendant liable under the Federal Safety Appliance Act. The government-owned track was 19 or 20 miles long. It was connected with the main line of defendant railroad. However, under agreement with the government, the railroad had exclusive operative control over the government tracks, including the spur. Under the same agreement, it had the duty to maintain the tracks, and the responsibility for inspection, maintenance, and repair of rolling stock. Plaintiff alleged that his injuries were proximately caused by reason of a car used on defendant's line being equipped with inefficient hand brakes. He based his cause of action solely

upon a violation of 45 USCA, § 11, of the Federal Safety Appliance Act. A judgment for plaintiff was affirmed. Defendant contended that no liability could attach to it because the defective car, at the time of the injury, was not being used on its line. It is clear that the contract with the government made the government's tracks a part of defendant's line of railroad, and the car was thus being used on its line of railroad. It is a situation similar to one where an operating railroad company leases the tracks of another owner railroad, a situation which is common. In the instant case, the quarry company with its own system of tracks, could, for the sake of argument, be considered another railroad company. Defendant did not operate over the quarry company's tracks. It only delivered empty cars to the quarry company's system and took them away when loaded. If, for instance, the quarry company's system had been owned and operated by the Northern Pacific Railway Company and an accident had happened such as the one that did happen, it certainly could not be argued that defendant company was transporting and using a claimed defective car on its own lines. The facts here have no resemblance to the facts in the Rush case.

In Brady v. Terminal Railroad Assn. 303 U. S. 10, 58 S. Ct. 426, 82 L. ed. 614, plaintiff was employed by the Wabash Railway Company as car inspector in its yard at Granite City, Illinois. He was injured while inspecting a car owned by the Wabash which had been brought by defendant from St. Louis to Granite City and placed by it upon a track of the Wabash known as a "receiving" or "inbound" track. The purpose of the inspection was to determine whether the car would be accepted by the Wabash. Both railroads were interstate carriers. Plaintiff was injured when he fell after taking hold of a defectively secured grabiron attached to the car. His cause of action was based on the Federal Safety Appliance Act. The supreme court of Missouri reversed a verdict for plaintiff, and was in turn reversed by the Supreme Court of the United States. The latter court

held that the use of the car by the terminal association under the meaning of the act had not ended. The court said (303 U. S. 13, 58 S. Ct. 428, 82 L. ed. 617):

"* * * The 'use, movement or hauling of the defective car,' within the meaning of the statute, had not ended when petitioner sustained his injuries. * * *

* * * * *

"* * * As the Wabash had not accepted the car, the Wabash had not assumed control and petitioner was examining the car in order to determine whether the Wabash should assume control.

"As the car had not been withdrawn from use and was still in the possession of the Terminal Association, its statutory obligation continued and the question is whether that duty was owing to petitioner. The fact that petitioner was not an employee of the Terminal Association did not necessarily absolve it from duty to him. We have said that 'the nature of the duty imposed by the statute and the benefits resulting from its performance' usually determine what persons are entitled to invoke its protection."

So in the above case, where the employe was a Wabash employe, injured because of a defective Wabash car spotted on a Wabash track, the court held that, because the use of the car by the terminal association had not ended, its statutory obligation under the act still continued. In Coray v. Southern Pacific Co. 335 U. S. 520, 69 S. Ct. 275, 93 L. ed. 208, it was held that the liability of a railroad under the Federal Safety Appliance Act for injuries inflicted as a result of violation of the act followed from the unlawful use of the prohibited defective equipment.

Before plaintiff in Brady v. Terminal Railroad Assn. *supra*, brought his action against the terminal association, he had brought suit against his employer, the Wabash Railway Company, alleging violation of 45 USCA, § 11. The supreme court of Missouri reversed a judgment in plaintiff's favor (Brady v. Wabash Railway Co. 329 Mo. 1123, 49 S. W. [2d] 24, 83 A. L. R. 655).

Petition for a writ of certiorari was denied by the Supreme Court of the United States (Brady v. Wabash Railway Co. 287 U. S. 619, 53 S. Ct. 20, 77 L. ed. 538). It had been stipulated between the parties that the defendant had not moved the car and had not done anything in connection with it except to detail plaintiff and another inspector to inspect it for the purpose of determining whether it complied with the Federal Safety Appliance Act and the rules and regulations of the interstate commerce commission. In other words, the car was not being used by defendant when the accident happened. The Missouri court said (329 Mo. 1131, 1135, 49 S. W. [2d] 26, 28):

"* * * Conceding that the car in question was not equipped with a secure handhold or grab iron on the roof at the top of the ladder, as required by this Act, it is not shown that the car in question was being 'hauled or permitted to be hauled or used on its line' by defendant at the time plaintiff received his injury by reason of such defective handhold. * * *

"* * * Defendant's liability or non-liability in this case, therefore, depends on whether it was, when plaintiff was injured, 'hauling or permitting to be hauled or used on its line' this Wabash car No. 76085 with the insecure handhold on its roof.

\* \* \* \* \*

"The decided cases, however, hold that the defective car must be in actual use by the defendant at the time of the injury in order to be within the provisions of the Safety Appliance Act. There is a difference in this respect between the requirements of the Safety Appliance Act and the Federal Employers' Liability Act in that liability under the Safety Appliance Act is not based on negligence, nor is it required that either the person injured be engaged in or the offending car be at the time used in interstate commerce. What is required is that the defendant be a carrier or highway of interstate commerce and that it be hauling or

actually using at the time on its line a car defective as to the safety appliances covered by the Act."

Shortly after the trial of the instant case, an action was tried by the federal district court of Minnesota, Nordbye, Judge, which involved facts almost identical with those in the instant case and against the same defendant, to recover for injuries sustained in the same quarry. (Paul v. D. M. & I. R. Ry. Co. [D. C.] 96 F. Supp. 578.) In the order denying a motion for a new trial, the court said:

"* * * plaintiff urges the applicability of the safety appliance provisions of the Federal Employers Liability Act. His position in this regard is clearly untenable. * * * At the time of this accident, the cars were not being used on defendant's railroad. They had been delivered to the Zenith Dredge Company and remained under the latter's exclusive control an appreciable time before the accident. * * * In view of the plain wording of the Safety Appliance Act, this Court has no right to extend its protection to employees of a quarry company which may be operating cars of a common carrier on the private tracks of the quarry company at a time when the cars, tracks, and the crew are in the exclusive control of that company and have been for an appreciable period of time."

In our opinion, it is clear that the Federal Safety Appliance Act has no application to our set of facts.

■ Plaintiff contends that, irrespective of the Federal Safety Appliance Act, under the evidence a sufficient showing was made to make applicable the rule of *res ipsa loquitur,* and that therefore the case should have been submitted to the jury under common-law principles. There is no evidence disclosing the nature of the defect in the braking equipment, if any. Plaintiff's position is that it is not necessary to show the defect, the fact of failure to operate being sufficient to bring the doctrine of *res ipsa loquitur* into play. The application of this doctrine permits the trier of facts, in the absence of evidence of specific acts of negligence, to reason from the result back to the cause—to infer fault on the part of the per-

son having control of some instrumentality from the failure of its operation to terminate in a safe or proper result when ordinarily a safe and proper result follows the exercise of care. The *res ipsa loquitur* doctrine rests upon inference and not on presumption. 4 Dunnell, Dig. & Supp. § 7044, where the Minnesota cases are collected. In Heffter v. Northern States Power Co. 173 Minn. 215, 217, 217 N. W. 102, 103, a leading case, we stated:

"* * * It is not the accident but the circumstances that justify the application of the doctrine. * * * The inference which the doctrine permits is grounded upon the fact that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to defendant but inaccessible to the injured person. * * * It may happen that a plaintiff makes a prima facie case by showing the accident with its attendant circumstances and yet he may destroy by his own evidence the application of the doctrine. * * *

"* * * Necessity seems the best support for the rule although some authorities base it on the doctrine of probabilities."

Professor Prosser, in an article in 20 Minn. L. Rev. 241, entitled *The Procedural Effect of Res Ipsa Loquitur,* states:

"Dean Wigmore has suggested [5 Wigmore, Evidence (2 ed.) § 2509, p. 498] three requirements for the application of res ipsa loquitur, which have been more or less uniformly accepted. The plaintiff must have been injured by an apparatus or instrumentality whose nature is such that injury is not ordinarily to be expected in the absence of negligence. At the time of the injury, both inspection and user must have been in the exclusive control of the defendant. And the injurious occurrence or condition must not have been due to any voluntary action on the part of the plaintiff."

These three requirements do not differ from those required under our decisions.

Professor Prosser continues:

"* * * The circumstances must be such as to give rise to an inference that someone has been negligent, and the defendant's

control of the situation must be such that the inference will point to the defendant. The mere occurrence of an accident alone, without these attendant circumstances, never will be sufficient to establish a res ipsa loquitur case, since it creates no reasonable inference that the defendant has been negligent."

In the instant case, plaintiff was injured by an instrumentality whose nature is such that injury is not ordinarily to be expected in the absence of negligence. Ordinarily, a brake will do the work expected of it when applied and no injury will result. To this extent, Dean Wigmore's first specification or requirement for the proper application of the *res ipsa loquitur* doctrine is met.

The car on which plaintiff was injured had been in the exclusive possession and control of the quarry company for two days prior to the occurrence of the accident. It follows that defendant had no possession or control of it during that time. The car had been transported over the quarry company's network of tracks by the latter's men and engines. It had been exposed to some snowfall. It had been loaded with heavy cover rock. Sometimes pieces of rock, snow, and ice would accumulate on the brake platform around the brake staff when cars were in the quarry. Sometimes brake staffs and brake chains were damaged either through the ordinary handling or loading of the car in the quarry. In fact, brake staffs and chains on its cars had been repaired by the quarry mechanics. Many things may have happened to the car and its brake mechanism after it was delivered to the quarry company. At the time of the injury, both inspection and user had not been in the exclusive control of defendant for two days. Thus, the second specification or requirement as laid down by Dean Wigmore for the proper application of the *res ipsa loquitur* doctrine is lacking.

The car had been spotted on a heavy downgrade. It was loaded with cover rock with an overload of 5,400 pounds. In the absence of a brake failure, the control of the car against the strong gravity downgrade pull was in the hands of plaintiff. It is a more reasonable probability that this accident occurred because plaintiff failed

to tighten the brake before the overloaded car gained too much momentum than that it was due to any neglect on defendant's part which might otherwise be inferred from the mere happening of the accident. Dean Wigmore's third specification that the injurious occurrence or condition must not have been due to any voluntary act on the part of the plaintiff is not met, since the accident could have been caused by plaintiff's own act. It cannot be said absolutely that the occurrence was not due to any voluntary act on the part of plaintiff.

In Mathews v. C. & N. W. Ry. Co. 162 Minn. 313, 320, 202 N. W. 896, 899, we said:

"The rule cannot apply, if * * * the accident itself is as suggestive of some other cause as it is of the negligence of the defendant. It cannot operate in favor of one whose own neglect of duty is within the realm of reasonable possibility as the agency of causation. The circumstances must exclude any reasonable probability that the fault of the one seeking to invoke it contributed to the result of which he complains. So, as a practical matter, the instrument of causation must have been at the time being in the control of the one sought to be charged with negligence."

Other questions have been raised, but in view of our disposition of the case, there is no object in discussing the same.

In our opinion, neither the Federal Safety Appliance Act nor the *res ipsa loquitur* doctrine is applicable to the facts here.

Order affirmed.