**PATTON v. BALTIMORE & O. R. CO.**
**(DUQUESNE SLAG PRODUCTS CO.,**
**third party defendant) (two cases).**

Nos. 10571, 10579.

United States Court of Appeals
Third Circuit.

Argued Feb. 21, 1952.

Decided June 23, 1952.

James P. McArdle, Pittsburgh, Pa. (P. J. McArdle, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, HASTIE, Circuit Judge, and HARTSHORNE, District Judge.

BIGGS, Chief Judge.

The plaintiff, as administratrix of the estate of her husband, John B. Patton, and as trustee ad litem for her own benefit and for the benefit of the five minor Patton children, brought suit against the Baltimore & Ohio Railroad Company seeking compensation for the death of her husband as a result of negligence on the part of the defendant with respect to the maintenance of brakes on its railroad cars.

Suit was first instituted in the Court of Common Pleas, Allegheny County, Pennsylvania, but on March 8, 1950 was removed to the District Court for the Western District of Pennsylvania on the grounds of diversity of citizenship.[1] On November 2 the court below permitted an amendment of the complaint so as to include an allegation that the defendant was negligent "(1) In violating the Safety Appliance Acts of Congress." On the same day the court below, on B & O's petition, directed the addition of Duquesne Slag Products Co. as a third-party defendant. Duquesne appeared and answered the third-party complaint. The plaintiff's complaint contained no allegations of negligence on the part of Duquesne,[2] nor was the complaint amended to set forth any cause of action against Duquesne.[3] The plaintiff has pleaded no

---

Marvin D. Power, Pittsburgh, Pa. (Margiotti & Casey, Pittsburgh, Pa., on the brief), for B. & O.

Thomas Raeburn White, Philadelphia, Pa. (William H. Peace, II, White, Williams & Scott, of Philadelphia, Pa., Prichard, Lawler, Malone & Geltz, Pittsburgh, Pa., on the brief), for Duquesne.

1. The plaintiff is a resident of Pittsburgh, Pennsylvania. She has been granted Letters of Administration on the estate of her husband by the Register of Wills, Allegheny County. We presume that she became trustee ad litem by order of the Court of Common Pleas, Allegheny County, though the origin of her authority does not appear in the record. The defendant is a Maryland corporation. Duquesne's citizenship does not appear from the record.

2. For instance, the complaint avers that Duquesne, "* * * through its agents, servants and employees and in a careful and cautious manner proceeded to unload the slag from the said cars * * * when by reason of the defective brakes on the said four Baltimore and Ohio cars * * * the four gondola cars proceeded to move down the grade * * * and kill the plaintiff's decedent."

3. In 1946 Rule 14(a), FRCP, 28 U.S.C., relating to joinder of parties was amended to render no longer possible the tender to plaintiffs of additional defendants. The sole basis for now including a third-party defendant in a suit is liability over to the defendant. The plaintiff's decedent was killed August 5, 1949, after the amendment of the rule.

cause of action against Duquesne. Only B & O has set forth such a cause of action.

The trial resulted in a verdict in favor of the plaintiff against both B & O and Duquesne in the sum of $65,000. Taking the inferences most strongly against the defendants, as we must, the following facts appear. The accident occurred on the afternoon of August 5, 1949. Patton's death was caused by four runaway B & O gondola cars which collided with eleven other cars parked downgrade on unloading tracks owned by Duquesne. Patton, a Duquesne bulldozer operator,[4] who was temporarily employed in repairing one of the parked cars, was caught in the collision and his body was severed near the waist by a car wheel. The four B & O cars were marked "For Slag Service Only". They had been placed on Duquesne's siding by B & O before dawn on August 5 as part of a slag train delivered daily. The cars had been loaded with slag at Jones & Laughlin Steel Co., located on the Monongahela Connecting Railroad, and were transferred to B & O by that carrier. The cars were part of a group of cars similarly marked and used for the purpose of disposing of Jones & Laughlin's slag to Duquesne and to Perini, another contractor. An inspector, not designated by name, but paid jointly by B & O and the Monongahela Connecting Railroad, made a report of his inspection of the cars at the interchange between these carriers. The inspector was not called to the stand but his report was introduced in evidence and showed that no visible defects in the braking apparatus of the cars had been noticed.

B & O conveyed the four cars to Duquesne's tracks. B & O employees set all the handbrakes, "bled" the air from the airbrakes, which in addition to the hand-

brakes of course served to apply the brake shoes on the cars. B & O employees then left the cars and, insofar as is pertinent here, that railroad had no further connection with the cars prior to the accident.

About 8 A.M. Vibock, an employee of Duquesne who inspected the cars in order that Duquesne might be protected from liability for any damages which might be incurred while the cars were not in Duquesne's possession, made an inspection but found no defects in the brakes. But Vibock was not required to make any test of the brakes. He was required only to observe such visible defects as broken chains or bent handles.

About 10 A.M. Duquesne employees using a Duquesne engine moved the four cars from the delivery track to an unloading track on Duquesne's premises. The unloading track was one which was on an ascending grade of undetermined degree.[5] The engine pushed the cars up this track to an unloading point. At the unloading point the airbrakes were set, the handbrakes tightened manually with the added leverage of a brake club, and a block of wood was set under a front wheel of that car which was farthest downhill. The air from the airbrakes was not "bled off" as had been done when the cars were delivered to Duquesne by employees of B & O. Nor were the retainer valves on the cars, designed to aid the retention of the air in the airbrakes, set for this purpose. The Duquesne engine and its complement of engineer and brakeman then left the cars and proceeded on other business.

At the unloading point a clam bucket crane stood ready to scoop slag from the cars.[6] The bucket of the crane weighed about 500 pounds. A block had already been placed under one front wheel of the car farthest downhill. Hapchuk, the crane

---

4. Duquesne is now paying compensation to Patton's widow under a workmen's compensation agreement.

5. The tracks were temporary for it was the practice of Duquesne to move them to points where fill was desired. The grade was estimated to have had an average rise of 1.62 feet in 100 feet.

6. The cars were open-end gondolas which could be emptied by a "shovel" placed inside the car which would push the slag out the open end. The available "shovels" were, however, otherwise employed, and the cars in question were unloaded solely by use of the crane and a hand shovel used by the crane operator's helper.

operator's helper, placed an iron skate under another wheel. The skate was pressed tight against the wheel but the wheel was not pushed upon the skate. Hapchuk also placed four-cubic-inch blocks under a wheel of each car except the car which was farthest downhill. Stewart, the operator of the crane, then unloaded the slag by lowering the clam bucket within three or four inches of the slag, dropping it the remaining distance and scooping out the slag. Stewart testified that some little vibration occurred during this process but that he never hit the side of any car and nothing was done which "could have caused" the cars to move.

By 1:45 P.M. three of the four cars had been unloaded. After the clam bucket was put down to take its first "bite" from the fourth car the cars began to move. Hapchuk threw a wooden block under the wheel of the last car. This block splintered. Two nearby workmen mounted two of the moving cars and attempted to tighten further the handbrakes on these cars. They jumped off when they found they could not do so. The cars rolled 700 feet and collided with the cars among which Patton was working. When the cars were brought to a halt the front car had run up upon its skate and the blocks had either been "jumped" out of position or splintered.

The plaintiff introduced ten witnesses, all employed by The Monongahela Connecting Railway in its assembly yards prior to and including August 5, 1949, to prove the inefficiency of the brakes. The ten stated they were inspectors, conductors, or brakemen. They stated they were familiar with the practice or were themselves required several times daily to "hump" [7] B & O cars marked "For Slag Service Only", and that none of these cars had adequate handbrakes. It was conceded that the

brakes would slow down a car but the ten witnesses were most positive in their statements that the brakes could not be relied upon to stop even an empty car. One of the ten stated it was his practice in handling B & O cars "For Slag Service Only" to use a "B & O brake", viz., a block of wood, and that when he first went to work he was told by a fellow employee " * * * not to bother putting the brake on. * * *" Others of the ten testified that in assembling trains of slag service cars the braking power of an engine was used, and if no engine was employed as a brake the men employed the handbrake to slow down the cars but jumped off before the moment of impact between the humped cars and the cars at rest. It would be difficult to imagine stronger testimony as to gross insufficiency of handbrakes. As to the airbrakes on the cars in the pool marked for "Slag Service Only", there was no record of inspection of cleaning since their installation by order of the I. C. C. in 1944.

A continuing objection was interposed by B & O to the testimony as to the braking efficiency of the cars marked "For Slag Service Only" on the ground that this was both irrelevant and prejudicial since it was not directed specifically to the four cars spotted at Duquesne but to all the cars in the pool. We think it could have been more clearly proven that the four cars involved in the instant suit were the cars handled by the Monongahela employees.[8] Yet that fact was sufficiently established. Nicotra, a Monongahela conductor, testified that Monongahela handled only two types of slag cars, hoppers carrying granulated slag to the Pennsylvania Railroad and gondolas carrying the rough slag to B & O. He said that rough slag, such as was here being unloaded, was transported only in B & O gondolas marked "For Slag Service

7. The process of riding a free rolling car coupling. The brakeman ordinarily uses down a slight grade to and into an assembly track where other cars await the handbrake to control the car.

8. For instance a B & O or Jones & Laughlin official could have been called to establish the business history of the four cars and others similarly marked. Hare-

kal, the Duquesne brakeman, was asked, "Q. And will you tell us whether you know these cars were cars used only for handling of slag from a point outside the yard of Jones & Laughlin track into the Highland Yard?" Mr. Power: "Now, if Your Honor please, I object." Mr. McArdle: "I withdraw the question, this witness may not be competent." The witness did not answer the question.

Only", and that only B & O cars were so marked. Bistolas, yard clerk for B & O, proved from that railroad's records that the four cars here in question, Nos. 251049, 251885, 255056, and 256339, were received from Monongahela destined for Duquesne shortly before August 5. Duquesne records disclosed that in the year prior to August 5, 1949, the four cars had made many round trips between Duquesne and Jones & Laughlin.[9] Harekal, a brakeman employed by Duquesne, stated he handled B & O cars marked for "Slag Service Only" "* * * about three times a day * * *". From this testimony it can be inferred that these four cars were part of the pool. The conclusion is almost irresistible that the four cars were part of the B & O group marked "For Slag Service Only" and were handled by the Monongahela witnesses. It would be entirely unreasonable to require trainmen to remember and to testify to six digit numbers on cars.

The record contains no proof of any specific mechanical defect in the brakes of the four slag cars. It was established by interrogatories and answers thereto that the cars were built and put into service between 1922 and 1925, that they were originally equipped with type "K" airbrakes, that in 1944 these brakes were changed to type "AB" by order of the I. C. C. The cars had "Horizontal wheel tightening type hand brakes." But B & O had "No records available" of any airbrake or handbrake inspection or repair since construction except the inspection for the visible defects made by the inspector jointly employed by B & O and Monongahela hereinbefore referred to. There was likewise no record of any test of brakes for operating efficiency. The plaintiff introduced into evidence subsection (m) of Rule 60 of the American Association of Railroads requiring cleaning of "AB" airbrakes every three years, and Rule 7 which requires appropriate records thereof to be kept for one year at the points where the

repairs are made. Hollen, locomotive engineer for Duquesne, testified that other cars marked like the four had run away on more than one prior occasion. Harekal, the brakeman, said that in initially setting the brakes he had done all he could to set the brakes on the four cars and that "* * * the brakes wasn't sufficient for them cars. * * *" This last statement is incontrovertible and the jury was entitled to find this as a fact.

Hodgson, a B & O locomotive engineer who delivered the cars to Duquesne's siding, stated that in his opinion the brakes were not set by Duquesne employees as tightly as they might have been. He stated it was his practice not only to make sure that handbrakes were applied by brakemen using the additional leverage of a brake club while air pressure remained applied to the brakeshoe, thus giving a tight set to the handbrakes, but also to "bleed off" the air. He stated that the bleeding process takes up some slack in brake chains and that the tightest set possible is advisable for the handbrakes constitute the sole braking power after the engine departs for the air in the brakes will leak out in time. Hodgson refused to state how long air could be relied on to remain in good brakes. His estimate was "* * * one hour to a week." This testimony was disputed by Bone, an experienced conductor of the Union Railroad, also testifying as an expert, who stated that bleeding adds nothing to the efficient set of handbrakes. It will be recalled that the air was not bled off when the four cars were left at Duquesne's unloading point. The jury could have concluded that the air must have leaked out in the period between 10 A.M. and 1:45 P.M.

Hodgson stated further that a car should be run up upon a skate, and that merely to place a skate in front of a wheel "* * * is a poor arrangement." Stewart and Hapchuk stated they had both been instructed by Duquesne's foreman, Leonard Patton,

9. Myers, Duquesne's Assistant Secretary-Assistant Treasurer, read from his records, "Car B & O 251049, including the time of the accident, two times; B & O 255056, including the time of the accident, twelve times; B & O 251885, including the time of the accident, two times; B & O 256339, including the time of the accident, thirty-five times.

in the use of the skate and had been told to press it on the track against the car wheel. They said they were not instructed to run a car up upon the skate so that no part of the wheel touched the rail.

It was not disputed that retainer valves are not used in yard work and that their purpose is solely to hold air in cars of a train going downhill so that an engine may rebuild its air-braking power. No opinion was expressed by anyone as to whether or not use of the retainer valves would have prevented the escape of the four cars from the unloading area. Nor was there any testimony as to the effectiveness of wooden blocks as brakes. Hodgson did testify that the use of wooden blocks are unnecessary when handbrakes are properly set.

The court charged the jury as follows: "You have heard a considerable amount of testimony as to the condition of the brakes on the slag cars owned by the railroad comjany. I instruct you that *the railroad company was required by law to equip its slag cars, when delivered, with brakes which were in proper operating condition and which were capable of both slowing down and stopping the slag cars properly.*[10] In other words, if the brakes on the slag cars were not efficient when the railroad company delivered the slag cars to the slag products company, that would be evidence on the basis of which you could decide that the railroad company had been negligent; and if the brakes were not efficient and if the fatal accident to Mr. Patton was because of those inefficient brakes, Mrs. Patton would be entitled to an award in damages against the railroad company in this case.

"You have also heard testimony concerning *the manner in which the employees of the railroad company tightened the brakes on the slag cars before those employees left the cars at the point from which the cars rode. Even if the brakes were efficient, of course, if the railroad employees did not exercise the degree of care which you believe they should have*

*exercised under the circumstances, that, too, would have been evidence from which you could find that the railroad was negligent.*[11]

"The next question for you to decide is whether or not the slag products company was guilty of negligence and whether or not any such negligence was the proximate cause of the fatal accident suffered by Mr. Patton.

"If you do award Mrs. Patton a recovery, I am going to ask that you make a finding which will be a single sum of money. * * *

"If you find that both the railroad company and the slag products company were negligent, then your verdict would be for a sum of money against both. * * *"

This charge did not in terms state that the Safety Appliance Acts, 45 U.S.C.A. § 1 et seq., were to be applied by the jury in reaching its conclusion as to negligence on the part of B & O. It is clear, however, that the charge was founded upon Section 2 of the Act of April 14, 1910, 36 Stat. 298, 45 U.S.C.A. § 11, for in the first portion thereof as above italicized it was stated that the railroad was required "by law" to have efficient brakes. This is not a statement of duty imposed on a railroad by common law. See Long v. Union R. Co., 3 Cir., 175 F.2d 198. Moreover, the opinion of the court below indicates that this Act was intended to be applied by the charge.[12] The charge of the court contained no explanation as to what might constitute negligence on the part of Duquesne. Negligence was defined as conduct below the standard of "a reasonable and prudent railroad." The jury may well have concluded that Duquesne would be negligent if it did not act in regard to setting the brakes on the cars as reason and prudence would dictate. But we cannot be certain of this. The portion of the charge with respect to negligence in the setting of the brakes of the four cars, as last italicized above, was probably directed to Duquesne. It was not applicable to the negligence alleged against B & O.

10. Emphasis supplied.

11. Emphasis supplied.

12. See 99 F.Supp. 455, 457.

Employees of B & O did not set the brakes "at the point from which the cars rode," as the court below stated, for its employees had departed before dawn on the day in question and the cars were moved about 10 A.M. by a Duquesne engine manned by the Duquesne crew. These men reset the brakes before the accident.

Motions in the alternative for a new trial and directed verdicts were made by both defendants and exceptions were taken to the charge. These were overruled and the jury brought in verdicts in the single sum of $65,000 against each defendant. B & O moved for judgment n. o. v. contending, as it does in this court, that there was no proof of common law negligence on its part and that the Safety Appliance Acts were inapplicable for the brakes of the cars were not defective *on its line*. B & O points out that the cars had been consigned to the exclusive possession of Duquesne. In the alternative B & O contended, and still contends, that it was entitled to a new trial because the testimony of the Monongahela employees should not have been admitted, and because the court below erred in its charge; first, as to the application of the Safety Appliance Acts, second, in its misconception of which defendant last set the brakes of the cars before the fatal accident, and third, because the jury was not instructed to bring in separate verdicts, one for the plaintiff as administratrix and the other for the plaintiff as trustee ad litem for herself and children. Duquesne for its part contended below, and continues to contend here, that there was no proof that it was negligent, and specifically that there was no proof it knew of defective brakes. Duquesne has likewise asked for judgment n. o. v., or in the alternative, for a new trial. Duquesne has not contended that the court's charge was incorrect, nor has it complained of the fact that the plaintiff asserted no claim for relief against it.

In our view of the present record and the law applicable thereto there was no warrant to enter directed verdicts or judgments n. o. v. sought by both defendants.

We are of opinion, however, that at least insofar as B & O is concerned a new trial must be ordered.

 Disposition of the appeals will be simplified by adverting first to B & O's contention that the testimony of Monongahela's employees as to the efficiency of the brakes on cars of the railroad marked "For Slag Service Only" was inadmissible, prejudicial, and so coupled with improper questioning by the court that its introduction *in toto* resulted in a denial to B & O of a fair trial. At the outset we state that the record reveals no improper conduct on the part of the trial judge. The contention of B & O which merits discussion is that " * * * the failure of a device cannot be proved by the failure of a similar device at some other unknown time and place when the owner did not have it under his management and control." [13] This recognized principle is, however, inapplicable to the facts before us. The time the brakes were defective was known here; the jury could have found that the brakes were inefficient immediately before the accident and for some time prior thereto. The Monongahela assembly yard, where only two types of slag cars were handled, was established as at least one place where the inadequacies of the braking devices had existed prior to the accident. The B & O owned these cars and had control of them and their braking equipment by virtue of the joint inspection for visible defects maintained by B & O and Monongahela. Moreover, the cars, as the evidence amply demonstrates, were part of a group making continuing cyclical trips in part over the tracks of Monongahela and B & O. It was proper for the court below to admit evidence of prior instances of inefficient brakes on similar, if not the same, cars provided that the prior instances were so closely related as to reasonably permit the inference that the brakes on the four cars also were defective. See Moreau v. Pennsylvania R. R. Co., 3 Cir., 166 F.2d 543, 545; Hadley v. Baltimore & O. R. Co., 3 Cir., 120 F.2d 993, 995; Lamb v. Philadelphia & Reading R. Co., 217 Pa. 564,

13. Brief for B & O, pp. 20–21.

66 A. 762. Cf. Wiegand v. Atlantic Refining Co., 189 Pa. 248, 42 A. 132. Both the offer of proof and the proof itself was here entirely different in character from the offer made in Paul v. Duluth, Missabe & Iron Range Ry. Co., D.C., 96 F.Supp. 578, 579. In that case the offer related to the experience of two witnesses with respect to ineffective brakes "on several occasions" six months before. It was not contended that the car which caused the accident was included in the experience of the witnesses. The testimony here, however, was that all Baltimore & Ohio cars marked "For Slag Service Only" which were handled by Monongahela employees had defective brakes. Nothing more was needed. The evidence, therefore, was material and pertinent and was properly received.

The position of B & O in support of its demand for judgment n. o. v. is that the plaintiff, having been unable to point to a structural defect in the braking apparatus of the four cars and consequently being unable to show a defect which was discoverable by reasonable inspection, must predicate liability of B & O either on the Safety Appliance Acts or on inferences of negligence to be drawn from the testimony of the Monongahela employees and from the fact that the cars ran away. B & O contends that the Safety Appliance Acts are not applicable here, that the testimony of the Monongahela employees was inadmissible, and that negligence may not be inferred first, because the cars were not in B & O's control at the time of the accident, and second, because negligence on the part of Duquesne was a contributing cause of Patton's death.

■ We conclude that the first contention of B & O is sound and that the Safety Appliance Acts are not applicable under the circumstances at bar. It follows that the court was in error in charging in respect to it. Section 2 of the Safety Ap-

pliance Act of 1910, setting forth the requirements of efficient brakes,[14] imposes an absolute duty upon carriers which did not exist at common law. See Long v. Union R. Co., supra; Myers v. Reading Co., 331 U.S. 477, 482, 67 S.Ct. 1334, 91 L.Ed. 1615. The benefits of this Act have been extended to persons other than employees of railroads. Fairport P. & E. R. Co. v. Meredith, 292 U.S. 589, 54 S.Ct. 826, 78 L.Ed. 1446. It has been applied also in cases where cars have left a railroad's line but have not been accepted by a connecting carrier. Brady v. Terminal R. Ass'n of St. Louis, 303 U.S. 10, 58 S.Ct. 426, 82 L.Ed. 614. This principle is implicit in our recent decision in Hartley v. Baltimore & Ohio R. Co., 3 Cir., 194 F.2d 560. The Act has also been held applicable where an injury occurred to a member of the Army Quartermaster Corps on tracks built and owned by the United States but which were exclusively operated by the railroad under contract with the United States. Rush v. Thompson, 356 Mo. 568, 202 S.W.2d 800. In Floyd v. Thompson, 356 Mo. 250, 201 S.W.2d 390, the protection of the Act was extended to a case where the injury occurred to a person other than an employee of the railroad on a spur at which the railroad had "spotted" cars for unloading but it does not appear from the opinion whether the railroad did or did not own the spur.

■ None of the foregoing decisions, however, involved facts such as those before us. In each there was but one railroad system involved. Here we are concerned with a situation where one railroad, B & O, has delivered its cars and another private railroad system, Duquesne's, has moved the cars, set the brakes and assumed control throughout the process of unloading. Duquesne, as we have said, had its own tracks, engine and crew. Moreover, Duquesne did, like other railroads, inspect and repair cars. In fact Patton was em-

14. "It shall be unlawful for any common carrier subject to the provisions of sections 1–16 of this title to haul, or permit to be hauled or used on its line, any car subject to the provisions of said sections not equipped with * * * [efficient handbrakes]". Act of April 14, 1910, c. 160, § 2, 36 Stat. 298, 45 U.S.C.A. § 11.

ployed in repairing cars when he was killed. In Paul v. Duluth, Missabe & Iron Range Ry. Co., supra, the plaintiff was injured in an accident occurring in a mine quarry where he was employed. The movement of railroad cars at the time of the accident was conducted entirely by a switch crew of the quarry and not by the defendant railroad. It was held that the Act did not apply. In Risberg v. Duluth, M. & I. R. Ry. Co., 233 Minn. 396, 47 N.W.2d 113, certiorari denied 342 U.S. 832, 72 S.Ct. 40, rehearing denied 342 U.S. 895, 72 S.Ct. 198, the plaintiff, another employee of the quarry in the Paul case, was injured in a collision resulting when he lost control of two cars of the railroad which he had been loading. The brakes were insufficient. The court refused to apply the Safety Appliance Acts pointing out that the railroad was not using the cars at the time of the accident and that they were and had been for some time in the quarry's control.

■ Congress in terms restricted the change which it effected by the Safety Appliance Act of 1910 in the common-law liability of the carrier to cases where the carrier might "haul, or permit to be hauled or used on its line, any car [equipped with inefficient brakes]". It may be argued that the railroad did haul on its line cars equipped with defective brakes. But this is not an answer. Congress changed the common law liability of the carrier only in cases where the accident was caused by bad brakes *and* the railroad was using or hauling the car or cars on its line. The Act did not provide that ownership or *prior* use by the railroad of a car or cars with insufficient brakes would serve as the basis for the absolute liability imposed on the carrier by the Act.

We conclude that the reasoning of the Supreme Court of Minnesota as expressed in Risberg, supra, as follows, is unassailable and accordingly we adopt it. The Court said: "In the instant case, the quarry company with its own system of tracks, could, for the sake of argument, be considered another railroad company. Defendant did not operate over the quarry company's tracks. It only delivered empty cars to the quarry company's system and took them away when loaded. If, for instance, the quarry company's system had been owned and operated by the Northern Pacific Railway Company and an accident had happened such as the one that did happen, it certainly could not be argued that defendant company was transporting and using a claimed defective car on its own lines." 233 Minn. at page 403, 47 N.W. 2d at page 117.

■ The second contention of B & O that negligence on its part may not be inferred, is also sound. In the absence of proof of negligence the railroad may not be held responsible unless it had control of the instrumentality at the time of the accident. This familiar rule of *res ipsa loquitur* has full support in the decisions of the courts of Pennsylvania. Semensky v. Pennsylvania R. R. Co., 156 Pa.Super. 555, 41 A.2d 217; Ambrose v. Western Maryland Ry. Co., 368 Pa. 1, 81 A.2d 895. See also Risberg v. Duluth, M. & I. Ry. Co., supra.

■ But the fact, however, that the plaintiff may not predicate B & O's liability on the Safety Appliance Acts or on an inference of negligence arising from the escape of the cars alone does not absolve the railroad. The plaintiff has, we conclude, another and separate basis upon which to base her claims, that of negligence actionable at common law. The railroad had the duty of delivering its cars in reasonably safe condition, and it was required to properly inspect them. Restatement, Torts, § 392; McGinley v. Central R. R. Co. of N. J., 235 Pa. 576, 84 A. 579; Rick v. New York C. & St. L. R. R. Co., 232 Pa. 553, 81 A. 650. Cf. Dominices v. Monongahela Connecting R. R. Co., 328 Pa. 203, 195 A. 747. The jury was entitled to believe that the cars were not delivered in reasonably safe condition for it could conclude that operational inefficiency of the brakes caused the cars to run away. It is true that in Pennsylvania the delivering railroad will not be held liable, although the cars be not reasonably safe, if the defect is not shown to be one which can be discovered by a reasonably thorough inspection. De-

sibia v. Monongahela Ry. Co., 262 Pa. 227, 105 A. 55; Ambrose v. Western Maryland Ry. Co., 368 Pa. 1, 81 A.2d·895. But in the light of all the evidence here presented, the jury would have been entitled to find that the defect in the cars was discoverable for the handbrakes would not hold. Whether B & O, through its inspector paid jointly with Monongahela, conducted an inspection reasonably adequate under all the circumstances was a question for the jury. Rick v. New York C. & St. L. R. R. Co., supra.

From the evidence before it the jury was entitled to conclude that the cars had not been properly inspected and that the failure of B & O to perform this duty was a proximate cause of the accident. It is clear that B & O made no operational test of the brakes' efficiency at the time of their receipt from Monongahela.[15] B & O had contented itself with mere visual inspection. We do not hold that a railroad must in every case perform operational tests of the braking efficiency of its cars. Cf. Ambrose v. Western Maryland Ry. Co., supra. But the jury here was entitled to find that all of the B & O cars marked "For Slag Service Only" had inefficient brakes. From this the jury would have been entitled to conclude that the B & O either knew or had reason to know that the brakes of the four cars involved in the accident were bad.[16] In the light of such a finding the jury was entitled to determine whether B & O's inspection of the cars was a proper and sufficient one under the circumstances. We think that under the circumstances at bar the jury could conclude that B & O had an aversion to operational inspection and preferred to avoid such inspection insofar as its slag cars were concerned. Judgment n. o. v. may not be granted.

We are not unmindful of the contention that the jury could have found that B & O's negligence was superseded as an active cause of the accident by negligence on the part of Duquesne. See Dominices v. Monongahela Connecting R. R. Co., supra. In that case it was held that if a consignee knows that a car is dangerous and yet does not warn its employees of the danger, the negligence of a railroad in failing to properly inspect may be superseded by its inability to foresee that the consignee would not give warning to its employees. It may have been true here that Duquesne knew the cars it unloaded had defective brakes. On the other hand, it is clear that the jury could have decided that Duquesne's conduct was foreseeable by B & O and that Patton was within the circle of risk created by B & O. The jury could have found that B & O should reasonably have anticipated that Duquesne in the light of its knowledge, if it had any, of the defective brakes, would employ, as it did, additional safety measures in an effort to hold the cars but would not warn a repairman employed by it to work downgrade. The jury could have concluded that B & O should have foreseen that Duquesne's precautions might be insufficient and that inefficiency of the brakes would remain a proximate cause of an accident.

■ Our conclusion with respect to Duquesne's demand for judgment n. o. v. is similar. Putting to one side for the time being any question of sufficiency of

---

15. Wiechelt, supervisor of inspectors paid jointly by the Monongahela and B & O, was interrogated as follows:

"Q. So a man passing along there, one of your Inspectors would only be looking for visible defects? A. That is right.

"Q. And he wouldn't know whether the brakes were efficient or not because he doesn't perform operating tests? A. That is right.

"Q. So, in effect, I presume all you mean to tell us, therefore, is that on these three days there were no bulging walls, there were no bent brake stands, there were no hand irons or grab irons missing or there was nothing else wrong that could be visible to an Inspector passing alongside of the car, is that it substantially? A. Sir?

"Q. Is that in substance what you mean to tell us? A. That is it, yes."

16. See Wigmore, Vol. II, 3rd Ed., § 252; Fitzgerald v. Edison Elec. Illuminating Co., 200 Pa. 540, 50 A. 161; Henderson v. National Drug Co., 343 Pa. 601, 613, 23 A.2d 743, 750.

pleading, ample evidence was introduced to support the jury's conclusion that Duquesne was negligent and that its negligence could be found to be a contributing cause of Patton's death. Under all the evidence the jury was entitled to find that Duquesne knew or had reason to know the brakes on the four cars were bad. Slag cars had run away before on Duquesne's tracks, and precautions in addition to use of the handbrakes were taken by Duquesne in an attempt to hold the cars in place. In the instant case the cars worked free despite the makeshift devices employed. Negligence on the part of Duquesne can be predicated on the use of appliances known to be defective, viz., cars with insufficient brakes. See Restatement, Torts, § 307. In any event, putting questions of pleading aside, the jury under the evidence could have held that the precautions taken by Duquesne were not reasonably prudent under the circumstances. These include, for example, the manner of applying the skate and the failure to bleed off the air in the air brakes.

We must order a new trial, however. The Safety Appliance Act of 1910 was not applicable and the trial judge erred in incorporating its elements in his charge. B & O is entitled to a new trial for the further reason that the jury was instructed that the railroad could be found to be negligent in setting the brakes of the four cars prior to the accident. As we have stated, Duquesne, not B & O, set the brakes immediately before the accident. The inadvertent misstatement of the trial judge was more than a statement of fact which the jury could have disregarded under the court's instructions as triers of the facts, for the trial court charged negligence based on the misapprehension.

We conclude also that the charge of the court on the asserted negligence of Duquesne was insufficient. As we have already indicated the court did not define Duquesne's negligence or state what acts constituted negligence on Duquesne's part if found by the jury to have taken place. The court instructed the jury only that it should decide whether the employees of the slag company were negligent as contended by B & O and that "When you review the testimony, if you find that it has not been proved that the slag products company was guilty of negligence, then your verdict as to the slag products company must be in favor of the slag products company." Duquesne on the present record also is entitled to a new trial.

But there are other and more fundamental reasons which require us to order a new trial. One of these is concerned with insufficiencies of pleading. Duquesne is described in the third-party complaint simply as a "corporation", the state of its incorporation not being set out. If Duquesne is a corporation of the State of Pennsylvania the plaintiff could not maintain an action against it. See the decision of this court in McDonald v. Dykes, 3 Cir., 163 F.2d 828, affirming D.C., 6 F.R.D. 569. It is hornbook law that the jurisdiction of a District Court of the United States must appear affirmatively on the face of the pleading, and for this reason if for no other the judgment must fall. If Duquesne was incorporated under the laws of some state other than Pennsylvania the plaintiff could assert a cause of action against it; if not, the plaintiff could not do so.

Despite the proof adduced by the plaintiff to show Duquesne to be negligent, the plaintiff did not amend her complaint to assert any cause of action against Duquesne. The only cause of action asserted by the plaintiff is against B & O. We would permit the application of Rule 15(b), FRCP, since we have found the evidence was adequate to prove Duquesne negligent, and would permit the court below to treat the complaint as amended to comply with the proof, if the judgment against Duquesne could be sustained. But in view of the fact that a new trial must be ordered, this salutary rule cannot be applied. Whether the plaintiff may be permitted to amend her complaint to assert a cause of action against Duquesne depends, among other things, on the citizenship of Duquesne. Such questions cannot be answered on the present record. If Duquesne is a Pennsylvania corporation, and there is some rea-

son to believe that it is such, though that fact must be determined in the first instance by the court below, it is clear that under our ruling in Sheppard v. Atlantic States Gas Co., 3 Cir., 167 F.2d 841, the plaintiff cannot maintain her suit against Duquesne.

We note also that B & O seems to have endeavored to tender Duquesne to the plaintiff as an additional party defendant [17] despite the 1946 amendment to Rule 14(a), FRCP. Such note 3, supra. This rule provides that the sole basis for bringing a third party defendant into the suit is liability over on the part of the third party defendant. We think that the language of the third party complaint is sufficient to allege liability over to the original defendant but B & O made no request for any charge on such a basis and the court gave no charge as to it. At the new trial the misapprehension of the parties, if it was such, as to their status may be corrected.

The court submitted the case to the jury upon the theory that B & O and Duquesne might be held to be jointly and severally liable to the plaintiff. The jury brought in a verdict " * * * in favor of the plaintiff against the Duquesne Slag Products Co. and the Baltimore and Ohio Railroad Company in the sum of $65,000. * * *" On this verdict the court entered a judgment " * * * in favor of the plaintiff, and against the defendants, the Duquesne Slag Products Co., and the Baltimore and Ohio Railroad Co., in the sum of sixty-five thousand dollars. * * *"

■ The plaintiff sued in two capacities; first, as administratrix of the estate of her husband under the Act of June 7, 1917, P.L. 447, § 35(b), as amended by the Act of July 2, 1937, P.L. 2755, § 2, 20 P.S. Pa. Ch. 3, Appendix, § 772, and, second, as trustee *ad litem* for herself and her minor children under the Act of April 15, 1851, P.L. 669 § 19, 12 P.S.Pa. § 1601.[18]

It is the case that under Section 1 of the Federal Employers' Liability Act, 45 U.S. C.A. § 51, the suit being brought by the representative of the deceased, a single verdict and a single judgment may be entered. It is possible that the trial court had this in mind in view of its attempted application of the Safety Appliance Act of 1910 for it appears from the record that the plaintiff requested separate verdicts in accordance with the Pennsylvania practice. See Pa.R.C.P. 2231(d), 12 P.S.Appendix; Vincent v. City of Philadelphia, 348 Pa. 290, 35 A.2d 65; Goodrich-Amram, Standard Pennsylvania Practice, Vol. 1, § 2201–38, at p. 53. Neither B & O nor Duquesne rallied in support of this request, but the point has been pressed by B & O both on its argument for a new trial and in this court.

■ At the new trial separate verdicts may be necessary. In an action for wrongful death the recovery, if any, passes to a limited group of beneficiaries as defined by statute. The recovery is apportioned among the beneficiaries in accordance with the intestate laws of Pennsylvania without regard to a decedent's will and the sum recovered is not available to creditors of the decedent. See the provisions of the Act of April 26, 1855, P.L. 309, § 1, as amended by the Act of April 1, 1937, P.L. 196, § 1, 12 P.S.Pa. § 1602. In a survival action the recovery enures for the benefit of the decedent's estate. Not only is it available to creditors, but likewise it passes in applicable cases to legatees pursuant to will. In re Davis' Estate, 56 Pa.Dist. & Co. 359; see Suders v. Campbell, D.C.M.D.Pa., 73 F.Supp. 112, 115; Funk v. Buckley & Co., Inc., 158 Pa.Super. 586, 591, 45 A.2d 918, 921. Cf. In re Lucabaugh's Estate, 74 Pa. Dist. & Co. 68.

If Patton left a will the personal representative must know how much of the verdict passes according to its terms. So

17. B & O alleged in the third-party complaint as follows:
 "Duquesne Slag Products Company, a corporation, should be joined as Third-Party Defendant in this action for the reason that the said corporation is alone liable for the cause of action complained of by his plaintiff or jointly or severally liable therefor with the defendant and thus liable to the defendant for all or part of the plaintiff's claim against the defendant."

18. See also 12 P.S.Pa. § 1602 through § 1604.

too, his creditors, if he has any. If, however, it can be proved on remand that Patton left no will and that his creditors, if any, have been satisfied, a court of the United States would be justified in departing from the procedure required by the law of Pennsylvania as described in the foregoing paragraph. If these affirmative facts be not fully demonstrated separate verdicts must be entered for a court of the United States could not serve as a probate tribunal to determine what portions of the single judgment rendered are to go to Patton's widow, his children, his creditors or his devisees or legatees. Under the circumstances Rule 61, F.R.C.P., cannot be applied.

In conclusion we point out that it is probable that much of the confusion which has resulted in this case stems from a misconception of the application of Rule 14(a) following the 1946 amendment. What the court below has done is render a single judgment against both defendants which, if it could stand, would be collectable from either or both; and this, despite the fact that the obligation of Duquesne to the plaintiff was determined by the Pennsylvania Workmen's Compensation Act of June 2, 1915, P.L. 736, as amended, 77 P.S.Pa. § 1 et seq.

The question as to whether or not B & O may maintain its third party action against Duquesne is not before us on the present record.

The case at bar was an apt one for full pretrial procedure. Insofar as the record discloses none was had. Most of the errors which occurred during the course of the trial could have been avoided had proper pretrial procedure been applied.

The judgment of the court below will be reversed as to both B & O and Duquesne. If Duquesne is a Pennsylvania corporation the court below must enter judgment in its favor and against the plaintiff. A new trial must be granted to B & O and to Duquesne if it is not a Pennsylvania corporation. The court below will be directed to proceed in accordance with this opinion.