Wallace L. ROUSE, Jr., and Lori Diane Rouse, Plaintiffs,

v.

CSX TRANSPORTATION, INC., Defendant.

No. CV 488–217.

United States District Court, S.D. Georgia, Savannah Division.

Aug. 8, 1989.

R.J. Beckham, Jacksonville, Fla., for plaintiffs.

Carol Branham and Arnold C. Young, Savannah, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

This diversity action involves an accident on a railroad car. Presently before the Court are defendant's motion for summary judgment and the parties' cross motions for partial summary judgment. For the reasons stated below, the Court hereby GRANTS plaintiffs' motion and DENIES both of defendant's motions.

## BACKGROUND

Plaintiff Wallace Rouse was an employee of Rail Switching Services, Inc. ("Rail Switching") when this action arose. Union Camp Corporation ("Union Camp") is a paper company that contracts with Rail Switching for various railroad services at the Union Camp mill. Defendant CSX Transportation, Inc. ("CSX") is one of two railroads that service the mill.

CSX delivers freight cars to Union Camp rail yard where the cars are loaded or unloaded by Union Camp employees. While the cars are on Union Camp's tracks, Rail Switching, under a contract with Union Camp, provides switching services. These "switching services" involve classifying cars according to the type of freight they contain and moving the cars to different tracks at the paper mill. Once Union Camp has finished with a car, Rail Switching moves the car to an outbound track in the rail yard to be picked up by CSX. Rail Switching operates three locomotives at Union Camp to move the cars, but neither Rail Switching nor Union Camp owns freight cars. The car that injured Rouse belonged to CSX.

Before a car leaves CSX's holding yard, CSX inspects it to be sure its equipment is in safe working order. If a car needs repairs that cannot be handled on the spot, the inspector sends it to the railroad's repair shop. Neither Rail Switching nor Union Camp inspects or repairs freight cars. union Camp's contract with CSX contains a provision calling for Union Camp to inspect cars upon their arrival at the mill, but the provision is apparently unenforced.[1]

On March 19, 1987, CSX delivered one of its cars to Union Camp. Rouse, working the March 20–21 midnight shift, climbed up on the car to release the hand brake. The brake wheel broke loose, causing Rouse to fall to the ground and to sustain back injuries.

Plaintiffs charge defendant railroad with negligence in inspecting the car from which Rouse fell, and they also seek to invoke the absolute liability standard of section 11 of the Safety Appliance Act ("the Act"), 45 U.S.C.A. § 1 et seq. (1910). Defendant has moved for summary judgment on the grounds that it exercised reasonable care as a matter of law in inspecting the railroad car. Defendant also seeks summary judgment on the grounds that it cannot be found liable to plaintiffs for a violation of the Safety Appliance Act because the car that injured Rouse was not "on its line" within the meaning of the Act. In the alternative, defendant moves for partial summary judgment on the question of the applicability of the Safety Appliance Act. Plaintiffs have also moved for summary judgment on the issue of the applicability of the Safety Appliance Act.

## SUMMARY JUDGMENT

The movant in an action for summary judgment "bears the exacting burden of demonstrating that there is no dispute as to any material fact." *Warrior Tombigbee Transp. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). The Court should only grant summary judgment in cases where "there is no genuine issue as to any

---

1. CSX's own lawyers were not aware of this contract until three months after the close of discovery in this case. Depositions of both CSX inspectors and Rail Switching employees, which were taken before CSX's lawyers became aware of the contract, reveal no expectation on the part of any deponent that either Rail Switching or Union Camp would inspect cars. Defendants do not contest that, in fact, no inspections of railroad cars took place once cars were received at Union Camp. *See* Plaintiffs' Statement of Material Facts, 7; Defendant's Statement Controverting Plaintiffs' Statement of Material Facts, 7.

material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970).

## ANALYSIS

### 1. Negligence

A railroad has a duty to inspect the railroad cars which it delivers to consignees and to exercise reasonable care in determining whether the cars are reasonably safe for use. *Roy v. Georgia R. & Banking Co.*, 17 Ga.App. 34, 35, 86 S.E. 328 (1915). Plaintiffs allege that defendant failed to exercise reasonable care in its inspection of the railroad car that injured Rouse because defendant did not discover the defective brake wheel. In support of this claim, plaintiffs have submitted affidavits from experienced railroad workers stating that a reasonable inspection would have revealed the defect. Defendant contends that a reasonable inspection would not have disclosed the defective brake wheel, and offers in support the deposition testimony of an experienced railroad car inspector.

■ The Court finds that there is a genuine issue of material fact as to whether CSX exercised reasonable care in inspecting the car. *Warrior Tombigbee Transp.*, 695 F.2d at 1296. The Court therefore DENIES defendant's motion for summary judgment on the issue of negligence.

### 2. Safety Appliance Act

Congress enacted the Safety Appliance Act, 45 U.S.C. § 1 *et seq.*, in 1910 to "increase the protection of operating train men to an extent beyond that furnished by the common law." *Spotts v. Baltimore & O.R. Co.*, 102 F.2d 160 (7th Cir.1938), *cert. denied*, 307 U.S. 641, 59 S.Ct. 1039, 83 L.Ed. 1522 (1939). The Act requires railroads to install certain safety equipment and imposes an absolute duty upon railroads to properly maintain that equipment. *See Lilly v. Grand Trunk Western R. Co.*, 317 U.S. 481, 485–86, 63 S.Ct. 347, 350–51, 87 L.Ed. 411 (1943). Section 11 of the Act requires that a railroad equip all cars "used on its line" with "efficient hand brakes." 45 U.S.C.A. § 11 (1910).[2]

Plaintiffs are proceeding under Georgia law, rather than under the Safety Appliance Act, which does not provide for a private cause of action.[3] Georgia law provides that the violation of a statute can constitute negligence *per se* if the person seeking to invoke the statute is a member of the class which the statute is intended to protect. *Huckabee v. Grace*, 48 Ga.App. 621, 632, 173 S.E. 744 (1934); *Atlanta and West Point R. Co. v. Underwood*, 218 Ga. 193, 194, 126 S.E.2d 785 (1962). Plaintiffs contend that Rouse is indeed a member of the Act's class of beneficiaries, but defendant argues that plaintiff was not within the ambit of the Act at the time he was injured because the car that injured him was not "on [the railroad's] line" within the meaning of the Act at the time of the accident.

If plaintiff is a member of the protected class, he can invoke the Act's absolute liability standard by a showing that his injuries stem from a defect in a required safety appliance.[4] Defendants do not contest that

---

**2.** Section 11 provides:
  It shall be unlawful for any common carrier subject to the provision of section 11–16 of this title to haul, or permit to be hauled or used on its line, any car subject to the provisions of said sections not equipped with ... *efficient hand brakes.*
  45 U.S.C. § 11 (1910)

**3.** Railroad employees injured by reason of a violation of the Act may proceed against their employer under the Federal Employers Liability Act ("FELA"). *Crane v. Cedar Rapids & I.C.R. Co.*, 395 U.S. 164, 166, 89 S.Ct. 1706, 1708, 23 L.Ed.2d 176 (1969). Since Rouse was not an employee of CSX at the time the accident occurred, however, he cannot prosecute this action under FELA. Rather, he must "look for his remedy to a common-law action in tort." *Id.* at 166, 89 S.Ct. at 1708.

**4.** The fact that Rouse was not employed by CSX does not remove him from the scope of the Safety Appliance Act. Nonemployees, though without a private cause of action under the Act, may still be intended beneficiaries. *See Shields v. Atlantic Coast Line R. Co.*, 350 U.S. 318, 76 S.Ct. 386, 100 L.Ed. 364 (1956).

Rouse was in fact injured by a defect in a handbrake, which is a required safety appliance.

### 3. The "on its line" requirement

It is well settled that a car need not be on tracks owned by a railroad to be considered "on [the railroad's] line" for purposes of the Safety Appliance Act. *See Brady v. Terminal R.R. Assn.,* 303 U.S. 10, 58 S.Ct. 426, 82 L.Ed. 614 (1938). The relevant question is whether the railroad had "control" of the defective railroad car. *Id.* at 15, 58 S.Ct. at 429 (forwarding railroad in control of car and therefore held liable for injury occurring on receiving railroad's tracks during initial inspection of car by receiving railroad). *See also Rush v. Thompson,* 356 Mo. 568, 202 S.W.2d 800 (1947) (railroad held liable for injury occurring on tracks owned by United States where railroad had exclusive operating control over the tracks).

Defendant contends that plaintiff's accident was not a result of a Safety Appliance Act violation because the accident did not occur while the defective railroad car was within the control of defendant railroad. 45 U.S.C.A. § 11. Only a few courts have considered whether a railroad is in "control" of a freight car for Safety Appliance Act purposes when the car is off the railroad's main tracks being loaded or unloaded by an industrial user.

In *Patton v. Baltimore & O.R. Co.,* 197 F.2d 732 (3rd Cir.1952),[5] plaintiff was killed as he repaired a railroad car parked on unloading tracks of Duquesne Slag Products Co. ("Duquesne"). B & O railroad would deliver cars to Duquesne's delivery tracks, from which Duquesne employees, using locomotive engines, moved the cars to unloading tracks. Duquesne employees would unload the railroad cars and then move the cars to an outbound track for B & O to pick up. Duquesne inspected and repaired railroad cars.

The *Patton* court absolved the railroad of liability under the Safety Appliance Act on the grounds that the cars were not "on

[B & O's] line" at the time of the accident. Distinguishing *Rush* and *Brady,* and adopting the reasoning of a Minnesota Supreme Court decision, *Risberg v. Duluth, M. & I.R. Ry. Co.,* 233 Minn. 396, 47 N.W.2d 113 (1951), *cert. denied* 342 U.S. 832, 72 S.Ct. 40, 96 L.Ed. 630 (1951), the *Patton* court characterized Duquesne as "another private railroad system." *Patton,* 197 F.2d at 741. The court went on to explain its characterization: "Duquesne ... had its own tracks, engine, and crew. Moreover, Duquesne did, like other railroads, inspect and repair cars. In fact [the plaintiff] was employed in repairing cars when he was killed." *Id.* at 740.

Two years later, in *Monongahela Railway Co. v. Black,* 235 F.2d 406 (1956), the Fourth Circuit reached the opposite result in a case involving the Pittsburg Consolidation Coal Company ("Pittsburg Coal"). Unlike Duquesne, Pittsburg Coal did not switch freight cars from a delivery track to a loading track. Rather, Monongahela Railroad would deliver cars directly to the loading track, which ran at a downgrade and passed under a coal chute. Gravity would cause the cars to roll under the chute, and Pittsburgh Coal employees would load the cars, setting the cars' brakes at the appropriate place on the track.

The Fourth Circuit held Monongahela Railroad liable under the Safety Appliance Act. The *Monongahela* court rejected the railroad's argument that the defective car was under the control of the coal company at the time of the accident and was therefore not "on [the railroad's] line." Distinguishing *Patton,* the court wrote:

> Even in the broadest sense, it cannot be said in this case that the Coal Company operated an independent railway system. The Coal Company owned no engines or other rolling stock and it operated none. It did not and was not equipped to inspect and repair freight cars; nor did [the railroad] expect it to do so. The Coal Company was a customer of appellant whose sole connection with the cars

5. This question has not been addressed in the Eleventh Circuit.

was the loading of them. *Monongahela,* 235 F.2d at 407.

The court continued:

> We are not prepared to hold that a railroad is relieved of its responsibility to provide safe appliances when it places one of its cars on a side track for the sole purpose of having it loaded with freight to be hauled by it ... [the industry's tracks] operated to promote commerce over appellant's line of railroad. *Id.* at 408.

*Patton* and *Monongahela* have provided the analytical framework for Safety Appliance Act actions where an accident has occurred on the railroad tracks of an industrial user. If the industrial user can be considered a "private railroad system," the industrial user rather than the railroad is deemed in "control." *Brady,* 303 U.S. at 13, 58 S.Ct. at 428. The car therefore is not "on [the] line" of the railroad, and the railroad is not liable under the Safety Appliance Act. The most significant factors in determining whether an industrial user runs a "private railroad system" are whether it employs engines to move cars on its tracks and whether it inspects and repairs cars. *See e.g., Bennett v. Weirton Steel, Co.,* 660 F.Supp. 827 (N.D.W.Va. 1987) (railroad not liable where steel company operates engines and employs repairmen who repair equipment on premises); *Jenkins v. Chicago & Eastern Ill. R.,* 5 Ill.App.3d 954, 284 N.E.2d 392 (1972) (railroad liable where industrial user neither operated nor maintained railroad equipment); *Hahn v. Terminal R. Assn. of St. Louis,* 355 S.W.2d 867 (Mo.Sup.Ct.1962) (railroad liable where industrial user operated a "trackmobile" but maintained no railroad cars or brake inspectors); *Barney v. Staten Island Rapid Transit Railway Co.,* 316 F.2d 38 (3rd Cir.1963) (railroad liable when it, not the industrial user,

placed cars in position on industrial user's tracks).

▌ The case at bar falls very near the factual dividing line inherent in the *Patton/Monongahela* analysis. Through its contract with Rail Switching, Union Camp operates several locomotives for moving cars on its tracks.[6] Thus, rather than relying upon a trackmobile, gravity, or the railroad's employees, Union Camp moves railroad cars itself. In that sense, this case resembles the *Patton* line of cases.

However, like *Monongahela* and the cases following it, the industrial user here asserts no responsibility for maintenance of the railroad cars, and is "completely reliant upon the railroad for the safe condition of the car delivered." *Jenkins,* 284 N.E.2d at 399. CSX's pre-delivery inspection of a car headed for Union Camp's mill is the final inspection of the car until the car is returned to CSX for transport. This is true although an unenforced provision in Union Camp's contract with CSX calls for Union Camp to perform inspections. Furthermore, neither Union Camp nor Rail Switching maintains facilities to repair railroad cars. If a Union Camp or Rail Switching employee notices a problem with a car, the employee calls CSX.[7]

In applying the *Patton/Monongahela* "private railroad system" analysis, the Court is mindful that the overarching question is one of "control" over the freight cars. *Brady,* 303 U.S. at 13, 58 S.Ct. at 428. This Court holds that *de facto* responsibility for inspecting and repairing cars is more indicative of control than is the method by which those cars are positioned once on the industrial user's tracks. The Court therefore concludes that neither Union Camp nor Rail Switching operated a "private railroad system" within the meaning of *Patton* and holds that, as a matter of

---

**6.** The *Patton/Monongahela* test focuses upon whether control over the railroad car has passed from the delivering railroad to the industrial user. Whether the industrial user chooses to engage an outside contractor to perform switching services, rather than to use its own employees, is not relevant to this inquiry. Therefore, the Court will consider Rail Switching and Union Camp together as the "industrial user."

**7.** In fact, Rail Switching called in CSX to repair the brake wheel that injured Rouse. The contract between Union Camp and CSX which calls for inspections by Union Camp also specifies that any repairs be referred to CSX.

law, plaintiff's accident occurred on the line of CSX within the meaning of the Safety Appliance Act.

## CONCLUSION

The Court finds a genuine issue of material fact exists regarding the reasonableness of defendant's inspection of the defective car. The Court therefore DENIES defendant's motion for summary judgment on the issue of negligence. Furthermore, the Court holds that, as a matter of law, the car which injured plaintiff was on the line of CSX for purposes of the Safety Appliance Act at the time the accident occurred. The Court therefore GRANTS plaintiffs' motion for partial summary judgment as to the applicability of the Safety Appliance Act, and DENIES defendant's motion for summary judgment on that issue.

SO ORDERED this 8 day of August, 1989.